# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| SOUTHWEST AIRLINES CO. PROFIT SHARING/401(K) COMMITTEE, on behalf of SOUTHWEST AIRLINES CO. PROFIT SHARING PLAN and the SOUTHWEST AIRLINES CO. 401(K) PLAN, | |
| Plaintiff, | CIVIL ACTION NO.: 3:06 CV 0747 D |
| vs. | ECF |
| UBS GLOBAL ASSET MANAGEMENT (AMERICAS), INC., f/k/a Brinson Partners, Inc., and UBS GLOBAL ASSET MANAGEMENT TRUST CO., f/k/a Brinson Trust Co., | |
| Defendants. | |

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)

Dated: September 22, 2006
*Of Counsel*

Vincent J. Connelly
Howard J. Roin
Jennifer R. Rakstad
James V. Hart
MAYER, BROWN, ROWE & MAW, LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Tel: (312) 782-0600
Fax: (312) 701-7711

Sharon A. Israel
Texas Bar No. 00789394
MAYER, BROWN, ROWE & MAW, LLP
700 Louisiana Street, Suite 3400
Houston, Texas 77002-2730
Tel: (713) 238-2630
Fax: (713) 238-4630
E-mail:  sisrael@mayerbrownrowe.com

*Attorneys for*

DEFENDANTS UBS GLOBAL ASSET
MANAGEMENT (AMERICAS), INC., AND
UBS GLOBAL ASSET MANAGEMENT
TRUST CO.

## **Table of Contents**

Table of Contents ..................................................................................................................... i

Table of Authorities ................................................................................................................ ii

Background ............................................................................................................................. 1

Governing Legal Principles .................................................................................................... 4

I.      Plaintiff's § 404(a)(1)(D) Claim For Failure to Follow Plan Documents Should Be Dismissed Because The Plan Documents Authorized the Enron Investments At Issue Here .............................................................................................................................. 5

II.     Plaintiff's § 404(a)(1)(B) Prudence Claim Fails Because It Rests On Hindsight And Cherry-Picking ............................................................................................................... 6

        A.      Plaintiff's Claim Rests on Hindsight. ............................................................... 7

        B.      Plaintiff's Claim Rests on "Cherry Picking." .................................................. 9

III.    Plaintiff's ERISA Claims Fail The Loss Causation Requirement ................................. 11

IV.     Plaintiff's Conflict Of Interest Allegations Do Not State A Claim Under Either § 404(a)(1)(A) Or § 406 ................................................................................................. 13

        A.      Plaintiff's Own Allegations Undermine The Conflict Of Interest Claims ....................... 14

        B.      Plaintiff's Allegations Do Not State a § 406 Claim ......................................... 15

V.      The Complaint Does Not State A Claim For Co-Fiduciary Liability. .......................... 17

Conclusion ............................................................................................................................. 17

## Table of Authorities

**Cases**

*Abbott Labs v. CVS Pharmacy, Inc.*, 290 F.3d 854 (7th Cir. 2002) ........................................... 14

*Amato v. Western Union Int'l, Inc.*, 773 F.2d 1402 (2d Cir. 1985) ......................................... 16

*Ames v. American Nat'l Can Co.*, 170 F.3d 751 (7th Cir. 1999) ............................................. 5

*Assoc. Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97 (5th Cir. 1974) .............................. 4

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) .......................................................................... 8

*Blackburn v. City of Marshall*, 42 F.3d 925 (5th Cir. 1995) .................................................. 4

*Blatt v. Muse Technologies, Inc.*, Civ. No. 01-11010, 2002 WL 31107537 (D. Mass. Aug. 27, 2002) ....... 8

*Brandt v. Grounds*, 687 F.2d 895 (7th Cir. 1982) ................................................................. 11

*Cadegan v. McCarron*, 26 Empl. Bens. Cas. 1855, 2001 WL 716111 (D.N.H. June 25, 2001) ................. 2

*Chao v. Stuart*, Civ. No. H-04-1115, 2005 WL 1693939 (S.D. Tex. July 20, 2005)................................. 16

*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496 (5th Cir. 2000) ........................................ 2

*Conley v. Gibson*, 355 U.S. 41 (1957) ................................................................................... 4

*DeBruyne v. Equitable Life Assurance Soc'y*, 720 F. Supp. 1342 (N.D. Ill. 1989) ....................... 7

*DeBruyne v. Equitable Life Assurance Soc'y*, 920 F.2d 457 (7th Cir. 1990)................................. 7

*Donovan v. Beirwirth*, 680 F.2d 263 (2d Cir. 1982) ............................................................... 16

*Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir. 1983) ....................................................... 13

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005)................................................. 13

*Franks v. Prudential Health Care Plan, Inc.*, 164 F. Supp.2d 865 (W.D. Tex. 2001) ............... 6, 10

*Gersten v. Rundle*, 833 F. Supp. 906 (S.D. Fla. 1993)........................................................... 15

*Grey ex rel. Rudd v. Beverly Enters.-Mississippi, Inc.*, 390 F.3d 400 (5th Cir. 2004)................. 4

*Guidry v. Bank of LaPlace*, 954 F.2d 278 (5th Cir. 1992) ..................................................... 4

*Harris Trust & Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000)................. 13

*Hunter v. Caliber System, Inc.*, 220 F.3d 702 (6th Cir. 2000) ........................................... 5, 6

*Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594 (3d Cir. 2000) ..................................................... 8

*In re CompUSA, Inc. Securities Litig.*, Civ. No. 3:94-CV-1151, et al., 1995 WL 811960 (N.D. Tex. Oct. 30, 1995)........................................................................................................... 3

*In re Cytyc Corp.*, Civ. No. 02-12399, 2005 WL 3801468 (D. Mass. Mar. 2, 2005) ................. 8

*In re Dynegy, Inc. ERISA Litig.*, 309 F. Supp.2d 861 (S.D. Tex. 2004) ................................. 15

*In re Enron Corp. Securities, Derivative & ERISA Litig.*, 284 F. Supp.2d 511, 580-81 (S.D. Tex. 2003) 17

*In re Executive Telecard, Ltd. Securities Litig.*, 979 F. Supp. 1021 (S.D.N.Y. 1997)................. 9

*In re General Motors ERISA Litig.*, Civ. No. 05-71085, 2006 WL 897444 (E.D. Mich. Apr. 6, 2006)....... 5

*In re LTV Securities Litig.*, 88 F.R.D. 134 (N.D. Tex. 1980) ............................................... 9

*In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp.2d 812 (N.D. Cal 2005)..................... 17

*In re NAHC, Inc. Securities Litig.*, 306 F.3d 1314 (3d Cir. 2002) ................................................ 8

*Keane v. Fox Television Stations, Inc.*, 297 F. Supp.2d 921 (S.D. Tex. 2004) ............................ 15

*Laborers Nat'l Pension Fund v. Northern Trust Quantitative Advisors, Inc.*, 173 F.3d 313 (5th Cir. 1999) ................................................................................................................................ 6, 7, 9, 10

*Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015 (5th Cir. 1996) ...................................... 3, 12

*Metzler v. Graham*, 112 F.3d 207 (5th Cir. 1997) ......................................................................... 7

*Movitz v. First Nat'l Bank of Chicago*, 148 F.3d 760 (7th Cir. 1998) ........................... 11, 12, 13

*Reich v. Lancaster*, 843 F. Supp. 194 (N.D. Tex. 1993) ............................................................ 16

*Seborowski v. Pittsburgh Press Co.*, 188 F.3d 163 (3d Cir. 1999) ............................................. 5

*Silverman v. Mutual Ben. Life Ins. Co.*, 941 F. Supp. 1327 (E.D.N.Y. 1996) ......................... 17

*Silverman v. Mutual Benefit Life Ins. Co.*, 138 F.3d 98 (2d Cir. 1998) ................................... 13

*Soo Line R.R. Co. v. St. Louis Southwestern Ry. Co.*, 125 F.3d 481 (7th Cir. 1997) .......... 15

*U.S. v. Causey*, Cr. H-04-025(S-2) (S.D. Tex. Dec. 28, 2005) .................................................. 4

*U.S. v. Fastow*, Cr. No. H-02-0665 (S.D. Tex. Jan. 14, 2004) ................................................. 4

*U.S. v. Glisan*, Cr. No. H-02-0665 (S.D. Tex. Sept. 10, 2003) ................................................. 4

*U.S. v. Lay*, Cr. H-04-025 (S.D. Tex. May 25, 2006) ............................................................... 4

*U.S. v. Skilling*, Cr. No. H-04-025 (S.D. Tex. May 25, 2006) .................................................. 4

*Vann v. Almours Securities, Inc.*, 96 F.2d 214 (5th Cir. 1938) ............................................... 9

*Willett v. Blue Cross & Blue Shield of Ala.*, 953 F.2d 1335 (11th Cir. 1992) ........................ 11

*Wright v. Nimmons*, 641 F. Supp. 1391 (S.D. Tex. 1986) ........................................................ 16

**Statutes, Rules, and Regulations**

29 C.F.R. § 2550.404a-1 ............................................................................................................. 9

29 U.S.C. § 1001 ......................................................................................................................... 1

29 U.S.C. § 1002(14) ................................................................................................................. 16

29 U.S.C. § 1104 ......................................................................................................................... 1

29 U.S.C. § 1104(a)(1)(A) ......................................................................................................... 13

29 U.S.C. § 1104(a)(1)(B) ..................................................................................................... 6, 10

29 U.S.C. § 1104(a)(1)(D) ........................................................................................................... 5

29 U.S.C. § 1105(a)(1) ............................................................................................................... 17

29 U.S.C. § 1106 .................................................................................................................. 13, 15

29 U.S.C. § 1106(a) .............................................................................................................. 15, 16

29 U.S.C. § 1106(b)(1) ............................................................................................................... 16

29 U.S.C. § 1106(b)(2) ............................................................................................................... 16

29 U.S.C. § 1109(a) .................................................................................................................... 11

FED. R. CIV. P. 10(C) ................................................................................................................... 2

FED. R. CIV. P. 12(B)(6) ................................................................................................................ 4

FED. R. EVID. 201(B)(2) ................................................................................................................ 3

FED. R. EVID. 803(17) ................................................................................................................... 3

Enron Corp. ("Enron") was one of the largest financial frauds in history.   After it collapsed in 2001, many of Enron's principals were convicted and jailed for deceiving the financial markets.   The complaint in this case alleges that plaintiff invested in a fund that purchased certain Enron investments and that plaintiff lost money when Enron defaulted.   Rather than target Enron (which undoubtedly is judgment-proof), however, the complaint seeks to hold the fund managers responsible for plaintiff's losses, supposedly because purchasing Enron paper violated certain provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*

As we show below, plaintiff's complaint does not state a claim and should be dismissed with prejudice.   *First*, contrary to plaintiff's assertion that purchasing Enron paper violated section 404 of ERISA because it conflicted with the directives set forth in the ERISA plan documents, those very plan documents (which must be considered on a motion to dismiss) establish that the Enron purchases were fully authorized.   *Second*, the prudence of defendants' Enron investments must be examined at the time of purchase, but plaintiff's claims are impermissibly based on hindsight.   *Third*, to establish an ERISA claim, plaintiff must plead and prove "loss causation," and plaintiff's complaint does not and cannot satisfy this requirement. *Fourth*, notwithstanding plaintiff's attempt to allege that the Enron purchases resulted from a conflict of interest, plaintiff's own complaint shows that there was no such conflict and no violation of ERISA.

## Background

The Parties.   Defendant UBS Global Asset Management (Americas), Inc., f/k/a Brinson Partners, Inc. ("Brinson") is a global investment firm headquartered in Chicago, Illinois, offering a number of managed funds as investment vehicles for pension and 401(k) plans.   Compl. ¶ 3.

Defendant UBS Global Asset Management Trust Company, f/k/a Brinson Trust Co. ("Brinson Trust") was the trustee for Brinson's managed funds.  The Brinson fund at issue in this case was its "Cash Management Fund."[1]

The plaintiff is Southwest Airlines Co. Profit Sharing/401(K) Committee ("Southwest"). Southwest offered the Cash Management Fund as an investment option for two of its 401(k) plans (the "Southwest Plans").  *Id*. ¶¶ 1, 9.  Thus, a portion of the assets of the Southwest Plans was invested in the Brinson Cash Management Fund.  *Id*. ¶ 9.

The Governing Agreements.  Brinson's relationship with Southwest was governed by an Investment Manager Agreement ("IMA"), which *inter alia* set forth the types of investments Brinson was permitted to make for the Southwest Plans.  *Id*. ¶¶ 9, 10 (describing the "express written agreement" between defendants and Southwest); Ex. A (IMA).[2]  The IMA, in turn, authorized Brinson to invest the Southwest Plans in accordance with certain "written investment policies."  Ex. A at A1 (IMA). And the written investment policies, set forth in Exhibit A to the IMA (the "Investment Policy"), provided that the Southwest Plans' assets "*will be* invested in . . . Brinson['s] Cash Management Fund," which is "an actively managed portfolio that invests in short term money market instruments and their equivalents."  Ex. A at A4 (emphasis added). The Investment Policy expressly authorized the Cash Management Fund to be invested in

---

[1]     The full name of the Cash Management Fund was "The Brinson Trust Company Collective Investment Trust for Pension and Profit Sharing Trusts – U.S. Cash Management Fund ("Cash Management Fund").  *Id*. ¶¶ 1, 4.

[2]     Where, as here, plaintiff explicitly refers to a document in the complaint that is central to plaintiff's claim, the court may consider it on a motion to dismiss.  FED. R. CIV.P. 10(C);  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) ("[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.");  *Cadegan v. McCarron*, 26 Empl. Bens. Cas. 1855, 2001 WL 716111 (D.N.H. June 25, 2001) (plan document, summary plan description, administration agreement, and policy may be considered on motion to dismiss ERISA claims).

"commercial paper, … loan participations, [and] bonds…or other evidences of indebtedness of domestic, foreign or supranational corporations," including paper, debt, and securities of "issuers rated in the highest three major categories by Standard & Poor's (A1, A2, and A3) and Moody's (P1, P2, and P3)" and "[u]nrated securities" of "comparable quality." *Id.*

The Disputed Enron Investments.  Plaintiff alleges that in October 2001, Brinson made two investments for the Cash Management Fund that supposedly were too "risky" for the Fund's parameters.  Compl. ¶¶ 11, 12, 17.  The two disputed investments were: (i) a $3,107,000 Enron unsecured bond purchased on October 3, 2001; and (ii) a $55 million Enron loan participation purchased on October 11, 2001.[3]  *Id.* ¶ 12.

When these investments were made, Enron was rated by Standard & Poor's ("S&P") as A2 and by Moody's as P2, and thus these investments in Enron-related debt were expressly authorized by Southwest IMA's Investment Policy.[4]  Two months later, however, Enron's ratings were lowered, and Enron collapsed, filed for bankruptcy, and defaulted on its obligations, including, the complaint alleges, the $3 million bond and $55 million loan participation.  Compl. ¶ 12**.**  In the aftermath of Enron's collapse, many of Enron's officers and employees, including

---

[3]    Brinson also made a third purchase of Enron paper – a $25 million Enron loan participation bought on October 11, 2001 – but before Enron collapsed it paid this participation in full on its maturity date, November 5, 2001.  Plaintiff's complaint does not seek any relief in connection with this $25 million Enron loan participation.

[4]    The Court should take judicial notice of Enron's S&P and Moody's ratings, as they are facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(B)(2);  *See Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) (taking judicial notice of filed SEC disclosures); *see also In re CompUSA, Inc. Securities Litig.*, Civ. No. 3:94-CV-1151, et al., 1995 WL 811960, at *9 fn. 14 (N.D. Tex. Oct. 30, 1995) (taking judicial notice of a company's stock performance).  *Cf.* FED. R. EVID. 803(17) (exempting "market quotations, [or] tabulations … generally used and relied upon by the public or persons in particular occupations" from hearsay rules because of the trustworthiness of such documents).

its Chairman and CEO, were convicted for fraudulently concealing Enron's actual financial condition from the market, including securities analysts and ratings agencies.[5]

### Governing Legal Principles

A complaint should be dismissed for failure to state a claim upon which relief can be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); FED. R. CIV. P. 12(B)(6). Although the complaint should be construed in the light most favorable to the plaintiff, "'[c]onclusory allegations and unwarranted deductions of fact are not admitted as true' by a motion to dismiss." *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992), quoting *Assoc. Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974). Finally, "'[d]ismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief.'" *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995) (citation omitted). As we show below, these principles compel dismissal here.

---

[5] Juries convicted Jeffrey Skilling, Enron's former chief executive officer, and Kenneth Lay, Enron's former chairman and CEO, on multiple counts of conspiracy, and wire and securities fraud. Verdict, *U.S. v. Skilling*, Cr. No. H-04-025 (S.D. Tex. May 25, 2006); Verdict, *U.S. v. Lay*, Cr. H-04-025 (S.D. Tex. May 25, 2006); see also Jury Instructions, *U.S. v. Skilling*, Cr. No. H-04-025 (S.D. Tex. May 15, 2006) ("securities fraud in relation to forms filed by Enron with the [SEC]" and "securities fraud based on presentations to securities analysts and ratings agencies"). A number of other senior Enron executives reached plea agreements with the U.S. Department of Justice, admitting their role in the manipulation of Enron's financial statements. See, e.g., Plea Agreement, *U.S. v. Glisan*, Cr. No. H-02-0665 (S.D. Tex. Sept. 10, 2003) ("conspiracy to manipulate artificially Enron's financial statements"); Plea Agreement, *U.S. v. Fastow*, Cr. No. H-02-0665 (S.D. Tex. Jan. 14, 2004) ("fraudulently manipulated Enron's publicly reported financial results"); Plea Agreement, *U.S. v. Causey*, Cr. H-04-025(S-2) (S.D. Tex. Dec. 28, 2005) ("fraudulently misled investors and others about the true financial position of Enron").

This court "may take judicial notice of another court's judicial action," including the fact that pleas or verdicts were admitted, because "the fact that a judicial action was taken is indisputable and is therefore amenable to judicial notice." *Grey ex rel. Rudd v. Beverly Enters.-Mississippi, Inc.*, 390 F.3d 400, 408 fn. 7 (5th Cir. 2004).

I.      **Plaintiff's § 404(a)(1)(D) Claim For Failure to Follow Plan Documents Should Be Dismissed Because The Plan Documents Authorized the Enron Investments At Issue Here.**

Plaintiff contends that Brinson violated section 404(a)(1)(D) of ERISA, which requires fiduciaries to discharge their duties "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). Specifically, plaintiff alleges that defendants' investments in the $3 million Enron bond and $55 million loan participation were "not consistent with the [Cash Management Fund's] objectives of providing safety of principal." Compl. ¶ 15.

In order for these allegations to state a claim, they must adequately allege that the defendants "in fact failed to follow the terms of the plan." *Hunter v. Caliber System, Inc.*, 220 F.3d 702, 721 (6th Cir. 2000), citing *Seborowski v. Pittsburgh Press Co.*, 188 F.3d 163, 170 (3d Cir. 1999). As we discussed earlier (page 2, *supra*), the governing plan document here is the Investment Manager Agreement, which in turn incorporates the Investment Policy. *See Ames v. American Nat'l Can Co.*, 170 F.3d 751, 758 (7th Cir. 1999) (a plan document is one "under which a plan is established or operated"); *In re General Motors ERISA Litig.*, Civ. No. 05-71085, 2006 WL 897444, at *17, *18 (E.D. Mich. Apr. 6, 2006) (granting motion to dismiss and finding "Investment Management Agreement" a "principle document[] governing [defendant's] responsibilities and authority as a fiduciary."). Thus, to state a claim, the complaint must adequately allege that defendants violated the IMA's Investment Policy.

The complaint clearly fails this test. The Enron investments at issue in plaintiff's complaint are a loan participation and bond, and the IMA's Investment Policy expressly authorized investments in "loan participations, [and] bonds." Ex. A at A4 (IMA). Moreover, the IMA Investment Policy expressly authorized investing in companies rated "in the highest three major categories by Standard & Poor's (A1, A2, and A3) and Moody's (P1, P2, and P3)," and at

the time defendants made these Enron investments (on October 3 and 11, 2001), Enron was rated as A2 by S&P and P2 by Moody's. Ex. B at A5, A6 (Credit Ratings). Thus, contrary to plaintiff's conclusory allegations that the Enron investments were "not consistent with the [Cash Management Fund's] objectives" (Compl. ¶ 15), in reality the governing plan documents explicitly allowed these very investments – both in terms of the type of investments (loan participations and bonds) and credit quality (A2/P2). Ex. A at A4 (IMA). Where, as here, the plaintiff's allegations conflict with the terms of the governing written agreement, the agreement controls and plaintiffs claim should be dismissed. *Franks v. Prudential Health Care Plan, Inc.*, 164 F. Supp.2d 865, 871 (W.D. Tex. 2001) ("Where an exhibit contradicts an assertion made in the complaint and eliminates any possible claim for relief, dismissal is appropriate."); *see also Hunter*, 220 F.3d at 721 (denying claim where "language in [the] provision authorizes" defendant's conduct).

## II. Plaintiff's § 404(a)(1)(B) Prudence Claim Fails Because It Rests On Hindsight And Cherry-Picking.

ERISA Section 404(a)(1)(B) requires a fiduciary to invest "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). Plaintiff contends that Brinson's purchases of the Enron bond and loan participation that later defaulted were violations of its obligation to act prudently. Two cardinal principles must be recognized when evaluating such a prudence claims. *First*, the claim cannot be based on hindsight. To the contrary, the prudence of an investment decision must be examined "at the time [the defendant] engaged in the challenged transactions." *Laborers Nat'l Pension Fund v. Northern Trust Quantitative Advisors, Inc.*, 173 F.3d 313, 317 (5th Cir. 1999), *cert denied*, 528 U.S. 967 (1999). *Second*, ERISA prudence analysis does not entail an examination of "each investment with an

eye toward its individual riskiness." *Id.* Rather, courts are to examine the prudence of the portfolio *as a whole*. *Id.* Plaintiff's prudence claim fails under both of these principles.

### A.        Plaintiff's Claim Rests on Hindsight.

Because the prudence of an investment decision is examined "at the time [the defendant] engaged in the challenged transactions," not in hindsight, "whether [the] investments succeeded or failed" is irrelevant. *Laborers*, 173 F.3d at 317. *See also DeBruyne v. Equitable Life Assurance Soc'y*, 720 F. Supp. 1342, 1348 (N.D. Ill. 1989), *aff'd* 920 F.2d 457 (7th Cir. 1990) (courts must only "consider the prudence of defendants' conduct at the time they made the investments," and "cannot judge defendants' investment decisions from the vantage point of hindsight."). Indeed, the Fifth Circuit has held that "[i]t is clearly *imprudent* to evaluate [investment decisions] solely in hindsight – plan fiduciaries can make honest mistakes that do not detract from a conclusion that their decisions were prudent at the time the investment was made." *Metzler v. Graham*, 112 F.3d 207, 209 (5th Cir. 1997) (affirming prudence of defendant's investment, despite its subsequent decline in value) (emphasis added). *See also DeBruyne v. Equitable Life Assurance Soc'y*, 920 F.2d 457, 465 (7th Cir. 1990) ("The fiduciary duty of care … requires prudence, not prescience.").

Plaintiff's allegations that Brinson's purchase of Enron paper was imprudent are all based on hindsight – not on the facts that existed at the time defendants made the disputed investments. Plaintiff asserts that "there were warnings of Enron's problems" in October 2001, including "endemic" insider selling, "opaque financial statements," and a "plummet[ing]" stock price. Compl. ¶ 17. But it is only in hindsight that these "warnings" foreshadowed Enron's failure and default. At the time Brinson bought the bond and loan participation, Enron bond prices were stable or rising, meaning these "warnings" were irrelevant to the market's valuation of Enron

debt.  Ex. C at A17 (Bond Prices).[6]  The two major rating agencies – which, as we showed

earlier, provided the standard for Cash Management Fund investments – considered all of these

supposed "warnings" as well, but saw no reason to predict that Enron would default.  The two

major rating agencies continued to give Enron high investment grade ratings – A2 by S&P and

P2 by Moody's,[7]  Ex. B at A5, A6 (Credit Ratings), and Enron's bonds were selling for more

than before the "warnings" began, Ex. C at A14, A17 (Bond Prices).

The fact that the major ratings agencies considered Enron securities to be of the second-

highest credit quality in October 2001 (and maintained investment grade ratings through

November 2001), Ex. B at A5, A6 (Credit Ratings), and that buyers continued to pay full price

for Enron debt, Ex. C at A17 (Bond Prices), shows that, even with "all publicly available

information," the market was unaware of Enron's weakness *at the time the investments were*

*made.  Basic Inc. v. Levinson*, 485 U.S. 224, 245-46 (1988) (employing the 'fraud-on-the-market'

presumption where "[r]ecent empirical studies have tended to confirm Congress' premise that the

---

[6]       This court can and should take judicial notice of the Enron daily bond prices, attached as Exhibit
C.  *In re Cytyc Corp.*, Civ. No. 02-12399, 2005 WL 3801468, at *12 fn. 35 (D. Mass. Mar. 2, 2005)
("Although the [sales] data is attached to defendants' [motion], it is appropriate to take judicial notice of
the sales price … on a motion to dismiss.").  The data in Exhibit C cover the period from January 1, 2001
to October 11, 2001, the date of the second Enron purchase.  Ex. C.  The sales price for the bond on
January 1, 2001, was 100.4728.  *Id.*  On October 11, 2001, the price was higher, reaching 102.1035.  *Id.*
These bond prices were collected using Interactive Data, Ex. C, consistent with the methodology used
elsewhere to judicially notice prices.  *See In re NAHC, Inc. Securities Litig.*, 306 F.3d 1314, 1331 (3d Cir.
2002) (judicial notice of stock price data compiled by Dow Jones News service); *Ieradi v. Mylan Labs.,
Inc.*, 230 F.3d 594, 600 fn.3 (3d Cir. 2000) (judicial notice of stock prices reported by Quotron Chart
Service).  The court is free to take judicial notice of pricing data from any "well-publicized and reliable
sources of information, without converting defendants' motions [to dismiss] into ones for summary
judgment," even if it elects not to rely on defendants' exhibit.  *Blatt v. Muse Technologies, Inc.*, Civ. No.
01-11010, 2002 WL 31107537, at *4 (D. Mass. Aug. 27, 2002) (court supplemented price data through
*sua sponte* judicial notice of stock prices using an internet website after parties provided only "limited
data" as to price).

[7]       According to S&P, A2-rated issuers have a "satisfactory capacity to meet its financial
obligations," while Moody's states that P2-rated issuers have a "strong ability for repayment of senior
short-term debt obligations."  Ex. B at A8, A13 (Credit Ratings).  Both S&P & Moody's maintained
Enron's A2/P2 rating until November 2001.  *Id.*, at A5, A6.

market price of shares traded on well-developed markets reflects all publicly available information"); *see also In re Executive Telecard, Ltd. Securities Litig.*, 979 F. Supp. 1021, 1028 (S.D.N.Y. 1997) (noting the plurality opinion in Basic "endorsed" the efficient market hypothesis); *In re LTV Securities Litig.*, 88 F.R.D. 134, 143 (N.D. Tex. 1980) (Higginbotham, J.) (the market "transmits information to the investor in the processed form of a market price…. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price."). It is thus *only* with the benefit of hindsight that these alleged "warnings" can be viewed as evidence that Enron would fail and default.

As the Fifth Circuit recognized years ago in the context of a breach of fiduciary case, "Hindsight is always better than foresight, and it is easy enough … by taking a backward look, to see the danger signals flying; but persons who buy and sell bank stocks … are not required to be so divining." *Vann v. Almours Securities, Inc.*, 96 F.2d 214 (5th Cir. 1938) (finding no liability where "bank's failure was not in a legal sense impending" when sales were made). Where, as here, Plaintiff's claim rests on hindsight, it fails to state a claim under ERISA.

## B.   Plaintiff's Claim Rests on "Cherry Picking."

Plaintiff's prudence claim also fails because it focuses solely on the two Enron investments that defaulted, rather than on the Cash Management Fund's portfolio and performance as a whole. Under ERISA and the governing regulations, a "fiduciary [is] required to act as a prudent investment manager under the modern portfolio theory rather than under the common law of trusts standard which examined each investment with an eye toward its individual riskiness." *Laborers*, 173 F.3d at 317; 29 C.F.R. § 2550.404a-1. Thus, it is not

enough to allege that those two investments were imprudent, without recognizing the role of those investments in the Fund's broader investment strategy.

Plaintiff's complaint contains no cognizable claim about how the Enron investments are imprudent in the context of the rest of the Cash Management Fund's investments or its overall strategy.[8]  Plaintiff's complaint alleges in a conclusory fashion that the Enron investments were inconsistent with the "objectives" of the Cash Management Fund to "provid[e] safety of principal," (Compl. ¶ 15), and reduce "risk" (Compl. ¶ 11), but has no answer for the fact that, as described in Section I (page 5, *supra*), the disputed Enron investments were expressly authorized by the Cash Management Fund's portfolio strategy as set forth in the IMA Investment Policy. Thus, notwithstanding plaintiff's conclusory allegations that the Enron investments did not fit within the Cash Management Fund's strategy, the express terms of the IMA and its Investment Policy show otherwise.   *Franks*, 164 F. Supp.2d at 871 ("Where an exhibit contradicts an assertion made in the complaint and eliminates any possible claim for relief, dismissal is appropriate.").

In short, plaintiff's attempt to challenge these two discrete Enron purchases without any cognizable claim about their purported lack of prudence in the context of the Cash Management Fund's overall portfolio is insufficient to state a claim under ERISA.  *See Laborers,* 173 F.3d at 322 (holding that "the district court erroneously judged the [challenged] investment in isolation …, instead of according to the modern portfolio theory required by ERISA policy as expressed by the Secretary's regulations.").   Accordingly, plaintiff's § 404(a)(1)(B) claim should be dismissed.

---

[8]     Indeed, as discussed above (page 3 fn. 3, *supra*), plaintiff ignores the third Enron investment made in October 2001: the $25 million loan participation which was purchased on October 11, 2001 and paid in full on November 5, 2001.

### III.   Plaintiff's ERISA Claims Fail The Loss Causation Requirement.

ERISA limits damages to the recovery of "losses to the plan *resulting* from each breach." 29 U.S.C. § 1109(a) (emphasis added).  An ERISA plaintiff, therefore, must adequately plead "that the breach of the fiduciary duty [was] the *proximate cause* of the losses claimed." *Willett v. Blue Cross & Blue Shield of Ala.*, 953 F.2d 1335, 1343 (11th Cir. 1992) (emphasis added); *see also Brandt v. Grounds*, 687 F.2d 895, 898 (7th Cir. 1982) (holding that section 1109 requires "a causal connection … between the breach of fiduciary duty and the losses incurred by the plan.").

Pleading "'but-for' causation [is not] sufficient" to satisfy the proximate cause requirement. *Movitz v. First Nat'l Bank of Chicago*, 148 F.3d 760, 762 (7th Cir. 1998).  Plaintiff must also plead and prove "loss causation," meaning that (1) plaintiff suffered "the kind of loss [that the] requirement that the defendant violated was intended to prevent," and (2) plaintiff's damages were a "foreseeable consequence of the [alleged] violation of a legal duty." *Id.*, at 763.

Plaintiff's complaint does not satisfy either prong of the loss causation requirement.  The complaint alleges that Brinson violated certain guidelines, such as that it would invest the Cash Management Fund "'primarily' in short term debt instruments" (Compl. ¶ 10), that it would obtain "high-level internal approval" prior to making "risk[y]" investments (*id.*), that it would "have signed documentation approved by [its] legal staff" (*id.* ¶ 14), and that it would limit a single issuer's paper to not more than 3% of the portfolio (*id.* ¶ 15).  But even if one assumes that these allegations are true, they do not satisfy the first prong of the loss causation test because Enron collapsed and defaulted for reasons completely unrelated to these alleged policy violations.  None of the guidelines that Brinson allegedly violated was designed – or could have been designed – to detect or prevent the kind of massive criminal fraud that brought down Enron. *See* pages 3-4, *supra*, and *Movitz*, 148 F.3d at 763 (finding no causation because the market

collapse that harmed the plaintiff's investment was not kind of less that the "requirement that the defendant violated was intended to prevent").

Plaintiff's complaint also fails the second prong of the loss causation test because it does not and cannot allege that Enron's collapse and default were "foreseeable consequence[s] of the [alleged] violation of legal duty." *Movitz*, 148 F.3d at 763. Thus, even if one assumes that Brinson failed to obtain the proper level of internal approval, that the Enron investments exceeded 3% of the portfolio, or that Brinson violated some other guidelines as plaintiff has alleged, nothing in the complaint indicates that Enron's default was a foreseeable consequence of those alleged violations. To the contrary, when Brinson made the two disputed investments, Enron appeared to have billions of dollars in assets[9] and was rated as an A2/P2 investment grade issuer (*see* page 6, *supra*). It was only after Enron's massive fraud began to be exposed and the financial markets began to learn about Enron's actual financial situation that Enron collapsed and defaulted. *See* pages 3-4, *supra*.

In short, because plaintiff's losses resulted from Enron's massive fraud, which was hidden from the financial markets until after Brinson made the purchases at issue here, the losses could not have "been generally foreseen" as a consequence of Brinson's alleged guidelines violations. *Movitz*, 148 F.3d at 764. Indeed, plaintiff's attempt to hold Brinson responsible for the sudden implosion of Enron at the end of 2001 is precisely the kind of claim that the loss

---

[9]    *See* Enron, SEC 2000 10-K (filed Apr. 2, 2001) (stating that "At December 31, 2000, Enron had working capital of $2.0 billion" with additional "credit lines provided for up to $4.2 billion of committed and uncommitted credit," and noting that "Enron's management believes it will be able to maintain its credit rating"), Ex. D at A26-27; Enron, SEC Second Quarter 10-Q (filed Aug. 14, 2001) (listing $847 million in cash or equivalents among more than $63 billion in total assets), Ex. E at A32. As highlighted above (page 3 fn. 4, *supra*), courts can take judicial notice of SEC filings. *See Lovelace v. Software Spectrum, Inc.*, 78 F.3d at 1017-18 (taking judicial notice of filed SEC disclosures).

causation doctrine is intended to bar. As Judge Posner explained in his opinion for the court in *Movitz*:

> [I]t is bad policy to encourage people harmed in some … financial disaster to cast about for someone on whom to lay off the consequences who had, however, committed only a technical breach of duty. The legal system is busy enough without shouldering the burden of providing insurance against business risks.

148 F. 3d at 763 (citations omitted). *Accord Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (statutes requiring causation are "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that [defendants' actions] actually cause.") (affirming grant of motion to dismiss). This causation requirement is particularly important in ERISA cases, where it "acts as a check on … broadly sweeping liability, to ensure that solvent companies remain willing to undertake fiduciary responsibilities with respect to ERISA plans." *Silverman v. Mutual Benefit Life Ins. Co.*, 138 F.3d 98, 106 (2d Cir. 1998) (Jacobs, J., concurring for a majority of the court). Because plaintiff's complaint does not satisfy the loss causation requirement, it should be dismissed.

### IV.   Plaintiff's Conflict Of Interest Allegations Do Not State A Claim Under Either § 404(a)(1)(A) Or § 406.

Plaintiff's complaint purports to bring conflict of interest claims under ERISA sections 404(a)(1)(A) and 406. Section 404(a)(1)(A) requires that ERISA investment decisions be made "solely in the interest of the participants and beneficiaries...." 29 U.S.C. § 1104(a)(1)(A). Section 406 supplements the general duty of loyalty prescribed in § 404(a)(1)(A) by listing certain "prohibited transactions," which are "illegal per se." *See* 29 U.S.C. § 1106; *Donovan v. Cunningham*, 716 F.2d 1455, 1464-65 (5th Cir. 1983); *Harris Trust & Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241 (2000) (same). As we show below, plaintiff's complaint does not state a claim under either section.

### A.     <u>Plaintiff's Own Allegations Undermine The Conflict Of Interest Claims.</u>

Plaintiff's conflict of interest claims rest on the assertion that Brinson made the two Enron purchases, not to benefit the investors in the Cash Management Fund, but rather in order to curry favor with Enron.  Specifically, the complaint alleges that Enron said it would give business to an investment bank (offering it so-called "Tier-1" status) if the investment bank would extend credit to Enron, and that Brinson purchased the $55 million loan participation and $3 million bond in a quest to become a "Tier-1 Bank" for Enron.  *See* Compl. ¶ 18.

As a threshold matter, neither Brinson nor Brinson Trust is an investment bank, so neither was in a position to benefit from investment banking fees.[10]  Moreover, plaintiff's theory that Brinson sought to curry favor with Enron through its purchase of the Enron loan participation makes no sense because, as the complaint itself alleges, Brinson purchased the loan participation from Toronto Dominion, *not* Enron.  Compl. ¶ 12.

More fundamentally, the facts alleged in plaintiff's complaint themselves demolish plaintiff's conflict of interest theory.  The complaint alleges that rather than increasing their financing of Enron, defendants *reduced* their credit to Enron during this period by "approximately $400 million" dollars – nearly seven times more than Defendants allegedly invested.  Compl. ¶ 19.  Plaintiff cannot seriously contend that defendants hoped to curry favor with Enron and earn "Tier-1" status by *reducing* their Enron investments by $342 million dollars, or by "threaten[ing] to terminate their 'Master Agreement' with Enron," *id.*, as these

---

[10]     *Cf.* Compl. ¶¶ 3-4 (describing the defendants).  Brinson and Brinson Partners do have affiliates that are investment banks, but the complaint makes no allegations concerning them.  Moreover, it is well established that defendants cannot be held liable for an alleged conflict of interest involving a corporate affiliate.  *Abbott Labs v. CVS Pharmacy, Inc.*, 290 F.3d 854, 858 (7th Cir. 2002) ("Each corporation's interests are distinct, and its legal attributes do not leak to investors or subsidiaries.  This norm applies fully to fraternal corporations" as well).

actions are plainly inconsistent with achieving defendants' supposed goal of extending credit to Enron. Compl. ¶ 18.

Where, as here, plaintiff "undermine[s] and contradict[s] his own allegations, he has essentially been 'hoist with his own petard' … [and] has 'pleaded himself out of court.'" *Keane v. Fox Television Stations, Inc.*, 297 F. Supp.2d 921, 932-33 (S.D. Tex. 2004) (citations omitted) (finding attached exhibits inconsistent with the pleadings and granting motion to dismiss). *Accord Soo Line R.R. Co. v. St. Louis Southwestern Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997) ("A plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts."); *Gersten v. Rundle*, 833 F. Supp. 906 (S.D. Fla. 1993) (court cannot accept the complaint as true "when the facts alleged are internally inconsistent") (granting motion to dismiss); *cf. also In re Dynegy, Inc. ERISA Litig.*, 309 F. Supp.2d 861, 897-98 (S.D. Tex. 2004) (dismissing conflict of interest claim where plaintiff "failed to allege an identifiable conflict that either benefited the defendants or caused an identifiable harm to the Plan."). Because plaintiff's own allegations undermine its conflict of interest theory, plaintiff's conflict of interest claims should be dismissed.

### B.   Plaintiff's Allegations Do Not State a § 406 Claim.

Plaintiff's complaint fails to state a section 406 prohibited transactions claim because the Enron purchases at issue here simply are not within the prohibited transactions enumerated in section 406.

The Enron transactions do not violate section 406(a), which prohibits certain "transaction between the plan and [a] party in interest." 29 U.S.C. § 1106(a). ERISA defines a "party in interest," in relevant part, as "any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of [an] employee benefit plan" or "a person

providing services to such plan." 29 U.S.C. § 1002(14)(A)-(B).  According to the complaint, the two disputed transactions are (1) the purchase of the Enron loan participation *from Toronto Dominion*; and (2) the *market purchase* of the Enron bond. Compl. ¶ 12.  Because neither of these purchases is a "transaction between the plan and [a] party in interest," 29 U.S.C. § 1106(a) – neither Toronto Dominion nor the market seller of the bond falls within either covered category – Section 406(a) is inapplicable.

Section 406(b)(1), which prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account," also is inapplicable.  29 U.S.C. § 1106(b)(1).  This section only applies to express self-dealing, where, unlike here, the fiduciary is a party to or direct beneficiary of the transaction.  *See, e.g.*, *Chao v. Stuart*, Civ. No. H-04-1115, 2005 WL 1693939 (S.D. Tex. July 20, 2005) (fiduciary's use of plan assets to pay business expenses violated § 406(b)(1)); *Reich v. Lancaster*, 843 F. Supp. 194 (N.D. Tex. 1993) (fiduciary overcharging plan insurance premiums violated § 406(b)(1)); *Wright v. Nimmons*, 641 F. Supp. 1391 (S.D. Tex. 1986) (fiduciary's use of trust assets to purchase personal real estate violated § 406(b)(1)).  Thus, because the defendants were not parties to either of the Enron purchases, section 406(b)(1) does not apply.

Similarly, section 406(b)(2) claims require "a transaction between the plan and a party having an adverse interest."  *Donovan v. Beirwirth*, 680 F.2d 263, 270 (2d Cir. 1982) (rejecting § 406(b)(2) liability).  But the complaint does not allege that the interests of the Plan and the transacting parties (e.g., Toronto Dominion, market seller of the Enron bond) are adverse. Compl. ¶ 12 (alleging only that the Enron purchases occurred).  Section 406(b)(2) therefore is inapplicable.  *Amato v. Western Union Int'l, Inc.*, 773 F.2d 1402, 1417 (2d Cir. 1985) (no breach where no "transaction with a party having an adverse interest" (internal quotations omitted).

## V.        The Complaint Does Not State A Claim For Co-Fiduciary Liability.

The complaint purports to allege a claim for co-fiduciary responsibility under section 405(a)(1) of ERISA.  See Compl. ¶¶ 25-26; 29 U.S.C. § 1105(a)(1).  "The elements of a claim brought under § 405(a)(1), 29 U.S.C. § 1105(a)(1), are '(1) that a co-fiduciary breached a duty to the plan, (2) that the fiduciary knowingly participated in the breach or undertook to conceal it, and (3) damages resulting from the breach.'"  *In re Enron Corp. Securities, Derivative & ERISA Litig.*, 284 F. Supp.2d 511 (S.D. Tex. 2003), quoting *Silverman v. Mutual Ben. Life Ins. Co.*, 941 F. Supp. 1327, 1335 (E.D.N.Y. 1996), *aff'd* 138 F.3d 98 (2d Cir. 1998), *cert. denied* 525 U.S. 876 (1998).  For the reasons stated earlier, plaintiff's complaint does not state a primary claim against either defendant.   And in the absence of a primary claim, a secondary liability claim under section 405 also cannot survive.  *See In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp.2d 812, 841 (N.D. Cal 2005) (dismissing cause and concluding that "[defendant] cannot be vicariously liable for the [co-defendants'] alleged wrongdoing because the court determined that [the co-defendants] did not violate section 404.").

## Conclusion

For the reasons set forth here and in the accompanying motion, defendants request that this Court dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted.

Dated: September 22, 2006                    Respectfully submitted,


                                             /s/ Sharon A. Israel
*Of Counsel*                                 Sharon A. Israel
                                             Texas Bar No. 00789394
Vincent J. Connelly                          MAYER, BROWN, ROWE & MAW, LLP
Howard J. Roin                               700 Louisiana Street, Suite 3400
Jennifer R. Rakstad                          Houston, Texas 77002-2730
James V. Hart                                Tel: (713) 238-2630
MAYER, BROWN, ROWE & MAW, LLP                Fax: (713) 238-4630
71 South Wacker Drive                        E-mail:  sisrael@mayerbrownrowe.com
Chicago, Illinois 60606-4637
Tel: (312) 782-0600                          *Attorneys for*
Fax: (312) 701-7711
                                             DEFENDANTS UBS GLOBAL ASSET
                                             MANAGEMENT (AMERICAS), INC., AND
                                             UBS GLOBAL ASSET MANAGEMENT
                                             TRUST CO.