IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SOUTHWEST AIRLINES CO. PROFIT | § | |
| SHARING 401(K) COMMITTEE, | § | |
| on behalf of SOUTHWEST AIRLINES | § | |
| CO. PROFIT SHARING PLAN and | § | |
| the SOUTHWEST AIRLINES CO. | § | |
| 401(K) PLAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:06-CV-0747-D |
| VS. | § | |
| | § | |
| UBS GLOBAL ASSET MANAGEMENT | § | |
| (AMERICAS), INC., f/k/a | § | |
| Brinson Partners, Inc., and | § | |
| UBS GLOBAL ASSET MANAGEMENT | § | |
| TRUST CO., f/k/a Brinson Trust | § | |
| Co., | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

In this action alleging that defendants breached their duties as ERISA[1] fiduciaries by investing in Enron Corp. ("Enron") debt for a profit sharing plan and a 401(k) plan, the court must decide whether the case should be transferred under 28 U.S.C. § 1404(a) to the Northern District of Illinois and whether it must be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief can be granted.  Concluding that defendants have failed to establish that the suit should be transferred and that they have not shown that plaintiff has failed to state a claim on which relief can be granted, the court denies defendants' motions

_____

[1]Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461.

to transfer under § 1404(a) and to dismiss under Rule 12(b)(6).

I

Acting on behalf of the Southwest Airlines Co. Profit Sharing Plan and the Southwest Airlines Co. 401(k) Plan (the "Southwest Plans"), plaintiff Southwest Airlines Co. Profit Sharing/401(k) Committee ("Southwest") sues defendants UBS Global Asset Management (Americas), Inc., f/k/a Brinson Partners, Inc., and UBS Global Asset Management Trust Company, f/k/a Brinson Trust Co. (collectively, "Brinson") for breaching fiduciary duties owed under ERISA. Brinson administered the Cash Management Fund ("Brinson Fund"),[2] which was an investment option in the Southwest Plans, both of which are governed by ERISA.[3] Under a written agreement with Southwest Airlines, Co., the sponsor of the Southwest Plans, Brinson was responsible for managing the investments of the Southwest Plans in the Brinson Fund. Because of the discretionary authority or control regarding the management or disposition of assets belonging to the Southwest Plans, Brinson qualifies as an ERISA fiduciary.[4]

---

[2]The full name of the Brinson Fund is "The Brinson Trust Company Collective Investment Trust for Pension and Profit Sharing Trusts - U.S. Cash Management Fund."

[3]The court recounts the facts favorably to Southwest as the nonmovant in relation to defendants' motion to dismiss. *See, e.g., Royal Bank of Canada v. FDIC*, 733 F. Supp. 1091, 1094 (N.D. Tex. 1990).

[4]Southwest asserts, and Brinson does not dispute, that Brinson is an ERISA fiduciary under 29 U.S.C. § 1002(21)(A).

In October 2001 Brinson purchased a $3,107,000 Enron unsecured bond with an August 1, 2002 maturity date.  Brinson also purchased through Toronto Dominion Bank ("Toronto Dominion") an unsecured Enron loan participation, in the principal amount of $55 million. Ultimately, these investments lost their value following Enron's collapse and eventual bankruptcy.  The Brinson Fund sustained a significant loss associated with both investments.

Southwest sues Brinson, alleging that it breached its fiduciary duties under ERISA and is liable to the Southwest Plans under 29 U.S.C. §§ 1109 and 1132(a)(2).  Alternatively, Southwest maintains that each Brinson entity is liable to the Southwest Plans under an aiding and abetting/conspiracy theory.  In separate motions, Brinson moves to transfer this case to the Northern District of Illinois under 28 U.S.C. § 1404(a) and to dismiss Southwest's action under Rule 12(b)(6) for failure to state a claim.

II

Brinson moves under 28 U.S.C. § 1404(a) to transfer this case to the Northern District of Illinois.

A

Section 1404(a) provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  "The

- 3 -

decision to transfer is made to prevent waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Bank One, N.A. v. Euro-Alamo Invs., Inc.*, 211 F.Supp.2d 808, 811 (N.D. Tex. 2002) (Fitzwater, J.) (citing *Stabler v. N.Y. Times Co.*, 569 F. Supp. 1131, 1137 (S.D. Tex. 1983)).   Nonetheless, the court may not transfer a case where the result is merely to shift the inconvenience of the venue from one party to the other. *Fowler v. Broussard*, 2001 WL 184237, at *6 (N.D. Tex. Jan. 22, 2001) (Fitzwater, J.) (citing *Ensersch Int'l Exploration, Inc. v. Attock Oil Co.*, 656 F. Supp. 1162, 1167 n. 15 (N.D. Tex. 1987) (Fitzwater, J.)).   Rather, "[t]he burden rests on the defendant to prove by a preponderance of the evidence that a plaintiff's choice of forum should be disturbed and transfer is appropriate based on a balancing of relevant factors." *Mannatech, Inc. v. K.Y.C., Inc.*, 2006 WL 2216033, at *2 (N.D. Tex. Aug. 3, 2006) (Solis, J.) (citations omitted); *see also Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1436 (5th Cir. 1989).   Here, unless the balance of factors strongly favors Brinson, Southwest's choice of forum remains intact. *Mannatech*, 2006 WL 2216033, at *2 (citing *TIG Ins. Co. v. NAFCO Ins. Co.*, 177 F.Supp.2d 561, 568 (N.D. Tex. 2001) (Sanders, J.)).

The first issue the court must address is "whether the judicial district to which transfer is sought would have been a

district in which the claim could have been filed." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) (per curiam). Brinson meets this requirement because the Northern District of Illinois would be a proper venue for the case given that Brinson is headquartered in Chicago, Illinois. *See* 28 U.S.C. § 1391(b); 29 U.S.C. § 1132(e)(2).

"The Court must then balance all relevant factors to determine whether the litigation would be more conveniently held in a different forum and whether the interests of justice would be better served by a transfer." *Mannatech*, 2006 WL 2216033, at *2 (citing *The Whistler Group, Inc. v. PNI Corp.*, 2003 WL 22939214, at *2 (N.D. Tex. Dec. 5, 2003) (Fish, C.J.)). In making its determination, the court considers "a number of private and public interest factors, none of which are given dispositive weight." *In re Volkswagen*, 371 F.3d at 203 (citing *Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 340 (5th Cir. 2004)).

> The private concerns include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive. The public concerns include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or] the application of foreign law.

*Id.* (citations and internal quotation marks omitted; bracketed material added).

B

The court considers initially whether the private factors weigh in favor of transfer. The first of these is the relative ease of access to sources of proof. Brinson argues that nearly all the relevant documents and records that will be at issue in this case are located in Chicago. It points to a related case, *Nelson v. UBS Global Asset Management (Americas), Inc.*, No. 1:03CV06446 (N.D. Ill. Sept. 11, 2003), contending that it produced tens of thousands of pages of documents, and it contrasts this with the total of 327 documents that Southwest produced in response to a broad subpoena by the *Nelson* plaintiff. Southwest does not dispute this evidence; instead, it points to the reduced significance of document location in modern cases and argues that this is not a sufficient reason to overcome the deference owed its choice of forum in this ERISA case.

Accessability and location of sources of proof are "less influential due to advances in copying technology and information storage." *Sargent v. Sun Trust Bank, N.A.*, 2004 WL 1630081, at *4 (N.D. Tex. July 20, 2004) (Fitzwater, J.) (citing *Mohamed v. Mazda Motor Corp.*, 90 F.Supp.2d 757, 778 (E.D. Tex. 2000)). Brinson has adduced no evidence and provided no argument about the expense or burden of transporting the relevant documents to Dallas for trial.

Further, although Southwest produced only 327 documents in response to the *Nelson* plaintiff's subpoena, neither side has presented evidence about how many documents Southwest is expected to produce in *this* case. Thus although this factor tends to weigh more in favor of transfer, its weight is only slight.

The court next assesses together the second and third private interest factors: the availability of compulsory process to secure the attendance of witnesses and the cost of attendance for willing witnesses. Although Brinson distinguishes in its motion between party and nonparty witnesses, neither side argues that compulsory process is needed to secure the attendance of any witness.[5] The court will thus consider only the cost of attendance for willing witnesses.

"The availability and convenience of witnesses has been held to be the most significant factor in deciding a § 1404(a) motion to transfer." *Mannatech,* 2006 WL 2216033, at *3 (citing *Busch v. Robertson*, 2006 WL 1222031, at *5 (N.D. Tex. May 5, 2006) (Lindsay, J.)). Brinson identifies several party and nonparty witnesses who were directly involved in the matters at issue in this case and whom it considers "key" witnesses. The party witnesses (i.e.,

---

[5]Brinson does cite Rule 45(b)(2) and points out that, of the three nonparty witnesses, two are within the subpoena power of the Northern District of Illinois and one is not. It does not maintain, however, that it would be unable to secure the attendance of any of these three witnesses if the case is litigated in this district.

current Brinson employees) are Robert Sabatino, who was the Brinson Senior Portfolio Manager in 2001 who was responsible for the day-to-day investing of the Brinson Fund and who purchased the two disputed Enron investments; Michael Markowitz, who was the head of Brinson's Short Duration Fixed Income group in 2001, which included the Brinson Fund, and was involved in the decision to hold the Enron investments until maturity; and Mark Kemper, Esquire, Brinson's general counsel, who was involved in negotiating the Investment Manager Agreement between Brinson and Southwest. Each witness resides in Illinois. Brinson also identifies three nonparty witnesses, Kirk Moore, Craig Hutson, and Benjamin Lenhardt. Two live in Illinois, and one lives in Minnesota. Brinson argues that the convenience of these key witnesses weighs heavily in favor of transfer.

Southwest does not dispute that all of Brinson's key witnesses live in or near Illinois and that a trial in the Northern District of Illinois would be more convenient for these party and nonparty witnesses. Instead, it argues that its own witnesses reside in Texas and that the case should remain in this forum for the convenience of these witnesses. Southwest specifically identifies three nonparty witnesses and six Southwest employees, each of whom lives in Texas, who will be called to testify at trial regarding Brinson's alleged attempts to conceal from Southwest its breaches of fiduciary duties, and the damages the Southwest Plans suffered

as a result of Brinson's allegedly wrongful conduct.

Brinson has established that the convenience of the Southwest witnesses should not be weighed as heavily as should the convenience of Brinson's witnesses, because the matters to which the Southwest witnesses will testify——concealment, which is not part of Southwest's claim for relief, and damages, which is mainly ministerial——are not as central to the case as is the testimony of Brinson's witnesses.  But it has not shown that the inconvenience to its own witnesses of testifying in Texas rather than in the Northern District of Illinois weighs any more than slightly in favor of transferring the case.  For the three party witnesses, testifying in the forum where the plaintiff filed suit is essentially nothing more than a fact of corporate life.  Brinson agreed to act as the fiduciary of Southwest's profit sharing and 401(k) plans.  Presumably it did so to make a profit (an expected and commendable purpose in a capitalistic economy).  It is not inherently inconvenient to require that its witnesses testify in the forum where the plans are administered, and where it was sued for allegedly breaching its fiduciary duties.  And Brinson has not demonstrated why it is inconvenient for these witnesses under the particular circumstances of this case.  It has adduced general information about the identities and locations of the witnesses and their connections to this matter, Ds. App. 84-88, and advanced what is essentially the *ipse dixit* assertion that they "would be

significantly burdened by this suit proceeding in Dallas." Ds. Br. Mot. Transfer 8.

This leaves the three nonparty witnesses. Although two reside in Illinois, Brinson has not shown that they will be inconvenienced by testifying in this district. As noted, it refers at one point in its brief to their (and other witnesses) being "significantly burdened," Ds. Br. Mot. Transfer 8, but this assertion is not supported by evidence of a burden of such magnitude. And Brinson has not shown that the burden on the Minnesota nonparty witness is sufficiently great as to warrant transferring the case. Although a flight from Minnesota to Chicago is somewhat more convenient than one from Minnesota to Dallas due to the differences in flight time, it weighs only slightly in favor of transferring the case. In sum, this factor weighs slightly in favor of transferring the case, but no more so.[6]

C

The court now turns to the public interest factors. It begins by considering the administrative problems that flow from court congestion. Brinson cites statistics from the Administrative Office of the United States Courts that show that each judge in this district have approximately 10% more docketed civil actions

---

[6]The fourth factor examines all other practical problems that make trial of a case easy, expeditious, and inexpensive. Brinson has not addressed this factor and has not shown under this private concern that the case should be transferred.

than do the judges of the Northern District of Illinois. Southwest does not dispute this evidence, but it argues that its import is outweighed because the median time for disposition of bench trials is shorter in this district than in the Northern District of Illinois. The data presented show that the median time from filing to disposition in the Northern District of Illinois is approximately 19 months, compared to 17.4 months in this court. This court has previously held that a difference of 1½ months in the median interval for case resolution is immaterial. *Sargent*, 2004 WL 1630081, at *4. Consequently, this difference is alone insufficient to defeat Brinson's argument based on relative docket sizes. Nevertheless, when this evidence is juxtaposed with the data concerning the two courts' caseloads, the court finds that the competing considerations of one court's slightly faster median disposition time and the other's slightly less congested docket render this factor neutral.

The court next considers the local interest in having localized interests decided at home. Southwest argues that Texas has an interest in protecting ERISA plans administered here from the conduct of breaching fiduciaries, even if the acts constituting such breaches occurred outside the state. Brinson argues that Illinois has a significant local interest in this matter because Brinson is located there and the conduct at issue took place in Illinois. Because each state appears to have a comparably

compelling interest in the suit, the court finds this factor to be neutral.

Finally, the court considers the familiarity of the forum with the law that will govern the case. Brinson argues that the case should be transferred to the Northern District of Illinois because Judge Kocoras of that court has already handled two virtually identical claims against Brinson. Although these cases concluded in settlement, the *Nelson* case had progressed through fact and expert discovery, summary judgment briefing, and trial preparation, settling with the assistance of Judge Kocoras on the first day of trial. But Judge Kocoras had not ruled on the summary judgment motions before trial, and Southwest argues that it is unclear how many issues he actually addressed in the cases before him. Because both related cases settled, Southwest maintains that this is not a situation in which any pertinent issues have already been judicially addressed or decided in another forum.

Brinson has not met its burden of establishing that this factor weighs in favor of transfer. Brinson points to the docket sheet in *Nelson* as evidence that Judge Kocoras dealt with several discovery and substantive motions and presided over several settlement hearings where the parties addressed key factual and legal issues, but it does not offer any evidence about the specific issues of which Judge Kocoras has specialized knowledge or that the same issues are likely to arise in this case. From the docket

sheet alone, the court is unable to say that Judge Kocoras has specialized knowledge of specific facts or legal issues relating to the *Nelson* case that would enable him to deal more efficiently with the present case. The court thus finds this factor to be neutral.[7]

D

Brinson bears the burden of proving by a preponderance of the evidence that this case should be transferred. *Mannatech, Inc.*, 2006 WL 2216033, at *2. In sum, two private interest factors weigh in favor, but only slightly. They are insufficient to persuade the court that this case should be transferred. Brinson has produced no evidence regarding the cost or inconvenience of transferring documents, and it does not argue that it will be unable to obtain the testimony of any nonparty witnesses if the case is tried in this forum. Even when the increased convenience of the Chicago and Minnesota witnesses is taken into account, the court is unable to find by a preponderance of the evidence that it would be more convenient for the parties and witnesses for this case to be litigated in the Northern District of Illinois. This appears to be a case in which a transfer would merely result in shifting the inconvenience of the forum from one party to the other, something this court may not do. *See Fowler*, 2001 WL 184237, at *6 (citing

---

[7]The fourth public interest factor—the avoidance of unnecessary problems of conflict of laws or the application of foreign law—does not apply. Neither side argues that this case presents such problems.

- 13 -

*Enserch Int'l Exploration*, 656 F. Supp. at 1167 n. 15).

Accordingly, Brinson's motion to transfer is denied.

### III

Brinson moves to dismiss Southwest's action for breach of fiduciary duty claim under Rule 12(b)(6) for failure to state a claim on which relief can be granted.

### A

Under ERISA, Brinson owed certain duties to Southwest as a fiduciary of the Southwest Plans.  29 U.S.C. § 1104(a), which is captioned "Prudent man standard of care," provides, in relevant part:

> (1) . . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
> (A) for the exclusive purpose of:
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan;
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
> . . .
> (D) in accordance with the documents and instruments governing the plan
> . . . .

Section 1106(b) prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account," and

- 14 -

§ 1105 prohibits a fiduciary from knowingly participating in or knowingly undertaking to conceal others' breaches of fiduciary responsibility, or enabling other fiduciaries to commit a breach of their duties, and requires fiduciaries to take reasonable efforts to prevent other fiduciaries' breaches.

Southwest maintains that Brinson breached its fiduciary duties by failing to act in accordance with the documents and instruments governing the Southwest Plans. It alleges that the purchase of the $3,107,000 Enron unsecured bond violated the Brinson Fund's restrictions on purchases of instruments with a maturity date in excess of 91 days. Southwest also avers that the $55 million Enron loan participation was an illiquid, complex investment, unrated by any credit rating agency, and involved an additional layer of credit risk over a normal loan, including not only the risk that the issuer would default, but that the seller (Toronto Dominion) would as well. The Brinson Trust Company Policy Manual, Policy No. 512C, required that "[loan participations] must have signed documentation approved by the legal staff of the Fund's advisor," if Brinson acquired such instruments for the Brinson Fund. Southwest asserts that Brinson did not follow this policy in purchasing and holding the Enron loan participation. It contends that the aggregate amount of A2/P2, A3/P3, and unrated paper in the Brinson Fund was not consistent with, and was substantially more aggressive in terms of credit quality than, the 30-day T-bill

"benchmark" set forth in the Brinson Fund guidelines, and was not consistent with the Brinson Fund's objectives of providing for safety of principal.   Southwest also avers that Brinson violated other internal investment restrictions.   Taken together, these allegations assert a claim that Brinson failed to act in accordance with the documents that governed the Southwest Plans.

Southwest also maintains that Brinson was involved in a serious and undisclosed conflict of interest while investing the Southwest Plans' money in Enron debt.   This allegation falls under § 1106(b), which prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account."   Southwest alleges that during the relevant time period, Brinson was seeking to become a "Tier-1 Bank" to Enron because Enron would only do business with those who extended it credit.   It asserts that the business Brinson wanted to do with Enron was projected at between $10 and $15 million in investment banking fees per year, and it was this incentive that caused Brinson to disregard its own internal rules for handling the Brinson Fund.

Southwest also posits that when red flags began to signal Enron's downfall, Brinson took approximately $400 million of its own funds out of Enron, but ignored the same red flags with respect to the Brinson Fund.   It alleges that Brinson could have sold or disposed of the Enron investments at a loss once things began to spiral downward for Enron, but it instead held on to the Enron

investments.

Brinson moves to dismiss under Rule 12(b)(6), contending that the ERISA plan documents establish that the Enron purchases were fully authorized; that the prudence of Brinson's Enron investments must be examined at the time of purchase, and Southwest's claims are impermissibly based on hindsight; that Southwest must plead and prove loss causation, but its complaint does not and cannot meet this requirement; that Southwest's complaint shows that there was no conflict of interest involved in the Enron purchases; and that the complaint does not state a claim for co-fiduciary liability.

B

"'[T]he motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted.'" *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982) (quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 598 (1969)). "[D]ismissal of a claim on the basis of barebones pleadings is a 'precarious disposition with a high mortality rate.'" *Id.* (quoting *Barber v. Motor Vessel "Blue Cat,"* 372 F.2d 626, 627 (5th Cir. 1967)). "The court may dismiss a claim when it is clear that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999) (per curiam) (Rule 12(c) decision) (citing *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir. 1990)). "In analyzing the

complaint, [the court] will accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id.* (citing *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996)). "The issue is not whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claim." *Id.* (citing *Doe*, 81 F.3d at 1401). "Thus, the court should not dismiss the claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint." *Id.* (citing *Vander Zee v. Reno,* 73 F.3d 1365, 1368 (5th Cir. 1996)).

C

Brinson contends that Southwest's claim that Brinson failed to follow plan documents must be dismissed because the governing plan document—the Investment Manager Agreement, which in turn incorporated the Investment Policy—expressly authorized investments in loan participations and bonds.  It also maintains that, at the time it made the investments, Enron met the minimum credit quality requirements specified in the Investment Policy. Brinson reasons that, because the investments at issue were clearly permitted under the terms of the Investment Policy, Southwest has failed to state a claim.

Southwest responds that Brinson's alleged compliance with the Investment Manager Agreement and attached Investment Policy does

- 18 -

not prevent Southwest from bringing a viable claim for breach of fiduciary duty under 29 U.S.C. § 1104(a)(1)(D).  It maintains that it has alleged that there are other governing plan documents that Brinson violated when it made the two Enron investments.  Southwest points to ¶¶ 14 and 12 of its complaint, in which it alleges that Brinson violated Policy No. 512C of the Brinson Trust Company Policy Manual ("Policy Manual"), which required that loan participations have signed documentation approved by the legal staff of the Brinson Fund's advisor, and the Brinson Fund's restrictions on purchases of instruments with a maturity date in excess of 91 days.  Southwest argues that the Policy Manual and other internal investment restrictions constitute documents and instruments governing the plan under § 1104(a)(1)(D) and that Brinson violated them when it invested in the Enron debt.

In reply, Brinson refers back to its opening brief and cites *Ames v. American National Can Co.*, 170 F.3d 751 (7th Cir. 1999), to argue that the documents on which Southwest relies are not among those that govern a plan under § 1104(a)(1)(D).  Instead, only documents that establish the plan among the parties or enumerate the parties' rights are included.  Brinson therefore contends that internal Brinson documents that were neither incorporated nor referred to in the Southwest Plans cannot be the basis for a claim under § 1104(a)(1)(D).

The court is unable to conclude based on the complaint and

plan documents alone that the only relevant documents for deciding this claim are, as Brinson contends, the Investment Manager Agreement and the Investment Policy. "Although ERISA imposes some restrictions on the provisions of a plan, it does permit specific statement of the administrator's duties, and, if the plan contains such a statement, those provisions control." *Offutt v. Prudential Ins. Co. of Am.*, 735 F.2d 948, 950 (5th Cir. 1984) (citing § 1104(a)(1)(D)). Accepting the allegations of Southwest's complaint as true, the Southwest Plans may have obligated Brinson to comply with the duties that Southwest identifies in ¶¶ 14 and 12 of its complaint. If there were other documents and instruments that governed the Southwest Plans in addition to those that Brinson cites in its motion, Brinson arguably had a fiduciary obligation to follow them. The court is unable to say at the Rule 12(b)(6) stage that Southwest will be unable to establish its claim that Brinson failed to comply with a controlling instrument or document when it made the Enron investments. This conclusion does not, of course, foreclose Brinson from demonstrating at a later procedural stage—say, on summary judgment motion or at trial—that the only controlling documents and instruments are the Investment Manager Agreement and Investment Policy and that the Enron investments were fully consistent with their terms.

Accordingly, the court declines to dismiss Southwest's claim that Brinson violated § 1104(a)(1)(D) by failing to act in

accordance with the documents and instruments governing the Southwest Plans.

D

Southwest alleges that Brinson breached its fiduciary duty by failing to act prudently in making the Enron investments.  Brinson moves to dismiss on the ground that this claim improperly rests on hindsight and cherry-picking.

To determine whether a fiduciary has acted prudently, "courts objectively assess whether the fiduciary, at the time of the transaction, utilized proper methods to investigate, evaluate and structure the investment; acted in a manner as would others familiar with such matters; and exercised independent judgment when making investment decisions." *Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc*., 173 F.3d 313, 317 (5th Cir. 1999) (citing *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984)). The test of prudence under ERISA "is one of conduct, and not a test of the result of performance of the investment.  The focus of the inquiry is how the fiduciary acted in his selection of the investment, and not whether his investments succeeded or failed." *Id.* (citations and internal quotation marks omitted).  "Thus, the appropriate inquiry is 'whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.'" *Id.* (quoting *Donovan v.*

*Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983)).

Brinson maintains that Southwest's claim that Brinson failed to act prudently must be dismissed because it is based only on hindsight rather than on the facts that existed when the investments were made.  It points to evidence that the market was unaware of Enron's problems when the bond and loan participation were acquired, including that Enron bond prices were stable or rising and that, despite the "warnings" of problems on which Southwest relies, two major rating agencies continued to give Enron high investment grade ratings, and its bonds were selling for more than before the "warnings" began.

The court cannot say at the Rule 12(b)(6) stage that Southwest is relying on hindsight alone to establish its claim.[8] The question whether Brinson acted prudently turns on an assessment of the facts surrounding Brinson's investment decision. *See Laborers Nat'l Pension Fund*, 173 F.3d at 317.  Under the highly deferential standard of *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), and viewing the allegations of Southwest's complaint in the light most favorable to it for purposes of deciding the motion to dismiss, *see, e.g., Royal Bank of Canada v. FDIC*, 733 F. Supp. 1091, 1094 (N.D. Tex. 1990) (Fitzwater, J.), the court is unable

---

[8]The court's decision in this case is made in the context of an ERISA breach of fiduciary duty claim.  This reasoning would not necessarily apply, for example, in evaluating whether, under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, a complaint impermissibly attempts to plead fraud by hindsight.

to say that Southwest can prove no set of facts, consistent with the allegations, that would entitle it to relief. The court therefore denies this ground of the motion to dismiss.

Brinson also argues that Southwest's claim must be dismissed because it is focusing only on the two Enron investments and has thus engaged in improper cherry-picking. Citing *Laborers National Pension Fund*, 173 F.3d at 317, and an ERISA-based regulation, Brinson maintains that the question whether it acted as a prudent investment manager is measured under the modern portfolio theory rather than under the common law of trusts standard. It contends that Southwest has failed to state a claim under § 1104(a)(1)(B) because the complaint fails to plead a cognizable claim in the context of the remainder of the Brinson Fund's investments or its overall strategy.

The court denies Brinson's motion on this ground because, viewed favorably to Southwest, the court cannot say at the Rule 12(b)(6) stage that Southwest will be unable, without relying improperly on cherry-picking, to prove that Brinson acted imprudently and thus breached its fiduciary duty.

E

Brinson contends that because § 1109(a) limits damages to the recovery of losses to the plan resulting from each breach, Southwest must adequately plead that the breach of the fiduciary duty was the proximate cause of the losses claimed. It posits that it is insufficient for Southwest to plead "but-for" causation; instead, it must plead and prove "loss causation," that is, that it suffered "the kind of loss [that the] requirement that the defendant violated was intended to prevent," and (2) plaintiff's damages were a "foreseeable consequence of the [alleged] violation of a legal duty." D. Br. Mot. Dis. 11 (quoting *Movitz v. First Nat'l Bank of Chi.*, 148 F.3d 760, 762 (7th Cir. 1998)). Brinson asserts that Southwest has failed to meet the first prong of the loss causation test because Enron collapsed and defaulted for reasons completely unrelated to the alleged policy violations. In other words, Brinson maintains that Southwest has failed to plead that it suffered the kind of losses that the policies that Brinson allegedly violated were intended to prevent. Brinson contends that Southwest has not met the second prong because it has not and cannot allege that Enron's collapse and default was a foreseeable consequence of the alleged violations of legal duty.

Brinson has not shown that *Movitz* has been adopted in this

- 24 -

circuit to require that a plaintiff *plead* loss causation.[9]  And the court cannot say at the Rule 12(b)(6) stage that Southwest will be unable to prove loss causation.   As with other arguments that Brinson makes for dismissal, when the court views Southwest's complaint favorably, it cannot say that Southwest will be unable to meet its burden of proof.

Southwest maintains that, in investing in Enron, Brinson violated certain of its own guidelines and restrictions designed to protect the Southwest Plans from risky investments.   The court cannot say that Southwest will be unable to prove that the Enron investments were the sort of bad investments that the guidelines and restrictions were designed to prevent.   Nor can it conclude that Southwest will be unable to prove that the financial losses the Southwest Plans sustained were caused by Brinson's failure to follow these guidelines and restrictions or that the losses were the reasonably foreseeable result of such failures.   The court must therefore deny Brinson's motion to dismiss under Rule 12(b)(6), leaving this issue for resolution at a later procedural stage of the case.

F

Brinson maintains that Southwest has not stated a claim under either § 1104(a)(1)(A) or § 1106.   Section 1104(a)(1)(A) requires

---

[9]The court's research indicates that the Fifth Circuit has not cited *Movitz* in a published opinion, and the court has located no unpublished Fifth Circuit opinion in which it has been cited.

that ERISA investment decisions be made "solely in the interest of the participants and beneficiaries."  Section 1106 provides that "[a] fiduciary with respect to a plan shall not . . . deal with the assets of the plan in his own interest or for his own account."

Southwest alleges that

> Defendants were seeking during the relevant time period to become a "Tier-1 Bank" to Enron at the urging of Andy Fastow.  The reason Defendants wanted to become a "Tier-1 Bank" was because Enron would only "do business" with those who extended it credit.  The business Defendants wanted to "do" with Enron was projected at between $10 and $50 million in investment banking fees per year.  It is not a coincidence, and is fair to conclude, that *Defendants "bent" (or disregarded) their own internal rules for handling of the Brinson Fund to find ways to support Enron*.

Compl. ¶ 18. (emphasis added).  Brinson argues that because it is not an investment bank, it could not have benefited from investment banking fees and that the complaint makes no sense because Brinson bought the loan participation from Toronto Dominion, not Enron.  It also posits that the facts asserted undercut Southwest's theory because the complaint alleges that, during the relevant period, it reduced its credit to Enron by nearly seven times what it had invested, which is counter to the notion of trying to curry favor and earn Tier-1 Bank status.  Brinson thus reasons that Southwest has pleaded itself out of court because its own allegations undermine its conflict of

- 26 -

interest theory. Concerning liability under § 1106, Brinson maintains that the Enron purchases are not prohibited because the loan was purchased from Toronto Dominion and the bond was acquired from the market. Therefore, neither was a transaction between the plan and a party in interest, neither amounts to self-dealing, and the complaint does not allege that the interests of the plan and Toronto Dominion and the seller of the bond were adverse.

Because the court must view the allegations of Southwest's complaint in the light most favorable to it, *see, e.g., Royal Bank of Canada*, 733 F. Supp. at 1094, the court cannot say that Southwest will be unable to establish that, in acquiring Enron debt, Brinson acted in its own self-interest and thus violated the fiduciary duty articulated in § 1104(a)(1)(A). Accordingly, the court denies Brinson's motion to dismiss Southwest's § 1104(a)(1)(A)-based claim on this basis.

Concerning its § 1106-based claim, Southwest contends in its response that it is relying only on the premise that Brinson dealt with assets of the Southwest Plans in its own interest for its own account. The court cannot conclude at the Rule 12(b)(6) stage that Southwest can prove no set of facts, consistent with the allegations of its complaint, that would entitle it to relief. Accordingly, this ground of Brinson's motion is denied.

G

Finally, Brinson maintains that because Southwest has not stated a primary claim against either Brinson entity, it cannot bring a secondary liability claim under § 1105. The court has not dismissed any of Southwest's claims against either Brinson entity and has not concluded that Southwest will be unable to establish a primary claim. It therefore denies this ground of Brinson's motion to dismiss.

H

Brinson has raised certain arguments in its Rule 12(b)(6) motion that may later bear fruit in narrowing or eliminating one or more components of Southwest's breach of fiduciary duty claim. But these contentions are essentially premature when evaluated in the context of a Rule 12(b)(6) motion to dismiss for failure to state a claim. The motion is therefore denied.

*     *     *

For the foregoing reasons, the court denies Brinson's August 10, 2006 motion to transfer venue and its September 22, 2006 motion to dismiss.

**SO ORDERED.**

January 29, 2007.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

- 28 -