**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| SOUTHWEST AIRLINES CO. PROFIT SHARING/401(K) COMMITTEE, on behalf of SOUTHWEST AIRLINES CO. PROFIT SHARING PLAN and the SOUTHWEST AIRLINES CO. 401(K) PLAN, | |
| Plaintiff, | **CIVIL ACTION NO.: 3:06 CV 0747 D** |
| vs. | **ECF** |
| UBS GLOBAL ASSET MANAGEMENT (AMERICAS), INC., f/k/a Brinson Partners, Inc., and UBS GLOBAL ASSET MANAGEMENT TRUST CO., f/k/a Brinson Trust Co., | |
| Defendants. | |

**DEFENDANTS' ANSWER
TO PLAINTIFF'S ORIGINAL COMPLAINT**

Defendants UBS Global Asset Management (Americas), Inc., f/k/a Brinson Partners, Inc. ("Brinson"), and UBS Global Asset Management Trust Co., f/k/a Brinson Trust Co. ("Brinson Trust") (collectively, "Defendants"), by and through their attorneys Mayer, Brown, Rowe & Maw LLP, answer the Plaintiff Southwest Airlines Co. Profit Sharing/401(k) Committee ("Southwest") Original Complaint as follows:

**ANSWER**

**I. NATURE OF THE ACTION**

Paragraph 1 states:

1.     This is a civil enforcement action brought pursuant to sections 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"). It concerns the Brinson Partners US Cash Management Fund (the "Brinson Fund"), which was administered by Defendants. The Brinson Fund was an investment option in the Southwest Plans, both of which are governed by ERISA. As a result of Defendants' causing the Brinson Fund to invest in and retain a large amount of risky debt, including debt of Enron Corporation ("Enron"), the Southwest Plans lost approximately $4 million. Defendants' actions constitute a breach of their fiduciary duties as

they were not only imprudent, but also the result of self-interested motives. Accordingly, Defendants are legally responsible under ERISA both to compensate the Southwest Plans for their losses and to remit to the Southwest Plans any and all benefits received by Defendants as a result of their breaches of their fiduciary duties.

Answer:

Defendants admit that the Complaint has been brought pursuant to ERISA provisions, 29 U.S.C. §§ 1109 and 1132. Defendants also admit that the Complaint concerns the Brinson U.S. Cash Management Fund (the "Cash Management Fund" or the "Fund"), that the Fund was administered as part of the Brinson Trust Company's Collective Investment Trust, and that the Southwest Profit Sharing and Southwest 401(k) Plans (the "Southwest Plans") were governed by ERISA. Defendants deny the remainder of this paragraph.

## PARTIES

Paragraph 2 states:

2.      Southwest Airlines Co. Profit Sharing/401(k) Committee is a named fiduciary of both Southwest Plans.

Answer:

Defendants are without information necessary to admit or deny paragraph 2, and therefore deny the allegations in this paragraph.

Paragraph 3 states:

3.      Defendant UBS Global Asset Management (Americas), Inc. f/k/a Brinson Partners, Inc. is a global investment advisory firm and was at all times relevant a fiduciary of both Southwest Plans.

Answer:

Defendants admit that Brinson is a global investment advisory firm and was a fiduciary of the Southwest Plans. Further answering, Defendants state that the Investment Manager Agreements between Brinson Trust and the Southwest Plans (the "IMAs") set forth the fiduciary duties between and among Brinson, Brinson Trust, and the Southwest Plans.

Paragraph 4 states:

4.       Defendant UBS Global Asset Management Trust Company f/k/a Brinson Trust Company is an Illinois corporation and was at all times relevant a fiduciary of both Southwest Plans.

Answer:

Defendants admit that Brinson Trust is an Illinois corporation and was a fiduciary of the Southwest Plans.   Further answering, Defendants state that the IMAs set forth the fiduciary duties between and among Brinson, Brinson Trust, and the Southwest Plans.

## II.  JURISDICTION AND VENUE

Paragraph 5 states:

5.       As the causes of action alleged herein arise under ERISA, this Court has jurisdiction over this lawsuit pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), as well as 28 U.S.C. § 1331.

Answer:

Defendants admit this Court has jurisdiction over the allegations contained in this Complaint under 29 U.S.C. § 1132(e)(1).   As Plaintiff has alleged only ERISA-related causes of action, 28 U.S.C. § 1331 does not apply.   Defendants deny any remaining allegations in this paragraph.

Paragraph 6 states:

6.       Venue is proper in this District under Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391 because the Southwest Plans are administered in Dallas, Texas.

Answer:

Defendants admit that the Southwest Plans are administered in Dallas, Texas. Defendants admit that venue is proper in this district, but aver that the U.S. District Court for the Northern District of Illinois is a more appropriate venue. On August 10, 2006, Defendants requested this action be transferred to the U.S. District Court for the Northern District of Illinois,

contending that the balance of public and private factors—including that all investment decisions at issue in the Complaint occurred in the transferee district—favored that venue. Defendants' motion for transfer was denied on January 30, 2007.

### III.  <u>STATUTE OF LIMITATIONS</u>

<u>Paragraph 7 states:</u>

7.    The causes of action asserted herein by the Southwest Committee on behalf of the Southwest Plans are within the limitations period imposed by ERISA section 413, 29 U.S.C. 1113 because the Southwest Committee did not have actual knowledge of all of the events constituting Defendants' breaches of fiduciary duty until mid-April, 2006.   Moreover, Defendants fraudulently concealed from the Southwest Committee certain facts concerning the losses incurred by the Southwest Plans when discussing those losses with the Southwest Committee. In particular, in and around February 2002 when meeting and communicating with the Southwest Committee, Defendants led the Southwest Committee to believe that the Enron-related purchases fully complied with all Brinson Fund investment guidelines.   Further, Defendants failed to disclose to the Southwest Committee at that time (or at any time) certain facts, including, *inter alia*, facts related to Defendants' existing conflicts of interest related to Enron.

<u>Answer:</u>

Defendants deny the allegations in this paragraph.

<u>Paragraph 8 states:</u>

8.    In addition, on November 24, 2004, a Class Action Complaint was filed in the United States District Court for the Northern District of Illinois, Eastern Division, which Class Action Complaint related to the same improper acts of Defendants with regard to the Brinson Fund as complained of herein by the Southwest Committee.   This Class Action Complaint sought to assert claims on behalf of all ERISA plans invested in the Brinson Fund such that the Southwest Plans were members of the putative class. This Class Action remained pending until April 20, 2006, at which time it was dismissed.   During the pendency of the Class Action, all applicable statutes of limitation were tolled as to members of the class, including the Southwest Plans. *See, e.g., Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983).

<u>Answer:</u>

Defendants admit that *Pruden v. UBS AG, et al.*, 04 C 7633 (N.D. Ill.) ("*Pruden*") was

filed as a class action in the Northern District of Illinois, Eastern Division, on November 24,

2004, and that a final order in *Pruden* was entered and the case dismissed on April 20, 2006.

Defendants are without information as to what the *Pruden* class action complaint "sought to assert," and therefore deny this allegation.  Plaintiff's claim that *Pruden* tolled any applicable statutes of limitations calls for a legal conclusion to which no response is required.  Defendants deny any remaining allegations in this paragraph.

IV.  **FACTUAL BACKGROUND**

Paragraph 9 states:

9.      In 2001, the Brinson Fund was an investment option in both Southwest Plans.  As such, a portion of the assets of both Southwest Plans was invested in the Brinson Fund.  By express written agreement with Southwest Airlines Co., the sponsor of both Southwest Plans, Defendants took on the responsibility for managing the Southwest Plans' investments in the Brinson Fund.  Because they exercised discretionary authority or discretionary control respecting management or disposition of assets belonging to the Southwest Plans, Defendants qualify as fiduciaries of such Plans under ERISA section 3(21)(A)(i), 29 U.S.C. § 1102(21)(A)(i). Moreover, Defendants have expressly acknowledged in writing their status as fiduciaries with respect to the Southwest Plans.

Answer:

Defendants admit that the Cash Management Fund was an investment option in the Southwest Plans and that a portion of the assets of the Southwest Plans were in fact invested in the Cash Management Fund.  Defendants also admit that the IMAs set forth the fiduciary relationships between and among Brinson, Brinson Trust, and the Southwest Plans, and that the IMAs also set forth the rights and obligations of the parties with respect to the Cash Management Fund.  Defendants deny that they qualify as fiduciaries in any way not set forth in the IMAs, and deny any remaining allegations in this paragraph.

Paragraph 10 states:

10.      Defendants had agreed to manage the assets held in the Brinson Fund, in part, according to a conservative investment philosophy of seeking safety of principal measured by a benchmark of the 30-day U.S. Treasury bill rate.  Defendants promised to invest the Fund "primarily" in short term debt instruments issued by governmental and corporate entities.  This instrument, maturity, and rate benchmark is consistent with the utmost safety and the lowest possible risk.  Upon information and belief, Defendants' internal rules governing Brinson Fund investments were also designed to exclude risky instruments, to ensure the investigation and

documentation of the investigation of investment decisions, and to require high-level internal approval prior to the making of any investment the risk attributes of which might possibly conflict with the Brinson Fund's objectives.  Indeed, until 2001, when the Brinson Fund management changed hands, the Brinson Fund had never sustained a loss for the previous twenty years during which time it had been managed by the same individual portfolio manager.

Answer:

Defendants deny Plaintiff's characterization of the Fund's investment philosophy.

Defendants state that the agreement to manage Southwest Plans assets in the Cash Management

Fund are set forth in the IMAs.  Further answering, the performance description of the Cash

Management Fund attached to the IMAs (hereinafter "Performance Descriptions") compare the

Fund's performance against both 30-Day U.S. Treasury Bills and the Hamilton Median Cash

Management Fund index, but Defendants admit that the 30-Day U.S. Treasury Bill was regarded

as the Cash Management Fund's "benchmark."   Defendants also admit that the Cash

Management Fund was invested primarily in "short-term money market instruments and their

equivalents," including those issued by governmental and corporate entities.  Defendants aver

that at the time of the Enron investments every Fund investment was consistent with the IMAs

and this investment description.

Defendants admit that prior to the Enron default the Cash Management Fund had never

suffered a loss, and that the Fund had been previously managed by Glenn Wozniak.  Defendants

deny any remaining allegations in this paragraph.

Paragraph 11 states:

11.    During 2001, new portfolio managers accomplished in a few months what had not happened for the past twenty years: they caused the Brinson Fund to sustain a loss.  Rather than keeping the Brinson Fund the conservative investment that it was represented to be, the new portfolio managers operated the Brinson Fund as a high-risk/lower credit investment fund.  The Enron investments that ultimately defaulted were placed in the Brinson Fund without proper and prudent credit analysis.  For example, Brinson Partners' credit analyst had doubts about Enron's credit worthiness and the responsible analyst was later severely penalized for allowing the Enron investments to be purchased.  Moreover, before purchasing the Enron investments, the

Defendants were warned by their own Chief Financial Officer about the excessive risk being taken by the Brinson Fund, but the new portfolio managers failed to take his advice.

Answer:

Defendants admit that the Cash Management Fund sustained its first loss in 2001. Defendants aver that the "new" portfolio managers operated the Fund consistently with the Southwest Plans' Investment Policies, as had the previous portfolio managers, and deny the remainder of this paragraph.

Paragraph 12 states:

12.     On October 3, 2001, Defendants purchased a $3,107,000 Enron unsecured bond due to mature on August 1, 2002.  Upon information and belief, this purchase violated the Brinson Fund's restrictions on purchases of instruments with a maturity date in excess of ninety-one days.  On October 11, 2001, Defendants purchased through Toronto Dominion Bank an unsecured Enron Loan Participation in the principal amount of $55,000,000.  Ultimately, both of these investments became essentially worthless after Enron's collapse in 2001 and eventual bankruptcy, and the Brinson Fund sustained the significant loss associated with both investments.  Upon information and belief, Defendants performed no investigation as to the merits and risks of the Enron investments prior to using the assets of the Southwest Plans to make such investments.

Answer:

Defendants admit that they purchased a $3.107 MM Enron unsecured bond (the "Enron Bond") on October 3, 2001, and admit the Enron Bond had a maturity date of August 1, 2002. Defendants deny that this purchase violated the Cash Management Fund's internal investment policies or the Investment Policies relevant to the Southwest Plans, which are attached as exhibits to the IMAs (hereinafter "Investment Policies").

Defendants admit that they renewed a $55 MM share in an Enron loan participation offered by Toronto Dominion (the "$55 MM LP") on October 11, 2001 after a previous $80 million loan participation held by the Cash Management Fund matured on that date.  Defendants further answer that the remaining $25 million share of the $80 million loan participation was also renewed with Toronto Dominion by the Cash Management Fund on October 11, 2001.  That $25

million dollar share (the "$25 MM LP") was renewed with a maturity date of November 5, 2001. On November 5, 2001, the $25 MM LP matured and was paid in full, resulting in a net profit of nearly $50,000 for the Cash Management Fund.

Plaintiff's phrase "essentially worthless" is vague, but Defendants admit that Enron defaulted on the $55 MM LP on November 29, 2001, and that subsequently both the $55 MM LP and the Enron Bond were sold at a loss.  The Enron Bond was sold for $714,610, and the $55 MM LP was sold for $12,168,750.  The monies recovered from these sales became assets of the Cash Management Fund.

Defendants deny the remainder of this paragraph.

Paragraph 13 states:

13.    The Enron loan participation, like all loan participations, was a far more complex investment than the ordinary commercial paper in which money markets typically invest.  In addition, it was, precisely because of the complexity of the master loan provisions to which it was subject, unrated by any credit rating agency such as Moody's or S&P.  It was also illiquid, meaning that there was not a readily-available secondary marketplace.  Moreover, loan participations inherently involve an additional layer of credit risk over a normal loan, including not only the risk that the issuer will default, but also the risk that the seller, here Toronto Dominion, will default.

Answer:

Defendants deny paragraph 13.

Paragraph 14 states:

14.    Attesting to the risky, non-standard nature of loan participations, as opposed to commercial paper, the Brinson Trust Company Policy Manual, Policy No. 512C, required that "LPCs [loan participations] must have signed documentation approved by the legal staff of the Fund's advisor," if Defendants acquired such instruments for the Brinson Fund.  However, upon information and belief, Defendants did not follow this policy before purchasing and holding the Enron loan participation.

Answer:

Defendants admit that Policy 512c states that loan participations must "have signed documentation approved by the legal staff of the Fund's advisor," but deny Plaintiff's assertion

that this was due to the "risky, non-standard nature of loan participations."  Defendants further

deny that they did not have such documentation prior to the purchase of the Enron investments,

as the original Master Loan Participation Agreement between Brinson Trust and Toronto

Dominion (the "Master LP") was negotiated effective as of July 1, 1991, was amended by

agreement on November 19, 1993, and remained in effect at the time of the Enron investments at

issue.  Defendants aver that the IMAs' Investment Policies expressly permit the purchase of

"loan participations," and that the purchase of the loan participation in question complied with

all legal requirements.  Defendants deny any remaining allegations in this paragraph.

Paragraph 15 states:

15.    The aggregate amount of A2/P2, A3/P3, and unrated paper in the Brinson Fund
was not consistent with, and was substantially more aggressive in terms of credit quality than,
the 30-day T-bill "benchmark" set forth in the Brinson Fund guidelines, and was not consistent
with the Brinson Fund's objectives of providing for safety of principal.  Upon information and
belief, Defendants also violated other internal investment restrictions, including those limiting
the amount of Enron debt to 3% of the portfolio, those requiring that the Enron paper be sold
when Defendants' internal credit rating plummeted, and those requiring committee approval.

Answer:

Defendants deny paragraph 15.

Paragraph 16 states:

16.    Moreover, despite the fact that the Brinson Fund was supposed to be priced daily,
Defendants did not revalue the Brinson Fund until November 29, 2001 despite the fact that its
value substantially decreased prior to the defaults.

Answer:

Defendants admit that the Cash Management Fund was to be priced daily, and aver that

the Fund was so priced.  Defendants deny that the Cash Management Fund was not "revalue[d]"

until November 29, 2001.  Defendants deny any remaining allegations in this paragraph.

Paragraph 17 states:

17.     In October 2001, when the Enron investments were purchased, there were warnings of Enron's problems, which Defendants had heeded with respect to their own money by limiting or forswearing Enron investments, but not with respect to the assets of the Southwest Plans invested in the Brinson Fund.  Insider selling at Enron was endemic in 2000 and 2001, and persisted even as the stock price fell.  Enron had long been issuing opaque financial statements.  On August 15, 2001, Jeffery Skilling, Enron's 47-year-old President, resigned after six months on the job with no credible explanation.  The price of an Enron credit protection contract, a derivative instrument which is essentially insurance against its default, escalated 18 percent.  By October 11, 2001, Enron's stock had plummeted to a fraction of its 2001 high and it continued to fall during November 2001.

Answer:

Defendants admit that Jeffrey Skilling resigned on August 15, 2001, and admit that by October 11, 2001 the price of Enron stock was below its 2001 high, but aver that the price of Enron stock had risen in October prior to Defendants' purchase.  Defendants deny the remaining allegations in this paragraph.

Paragraph 18 states:

18.     While Defendants were investing the Southwest Plans' money in Enron, they were mired in a serious and undisclosed conflict of interest.  Upon information and belief, Defendants were seeking during the relevant time period to become a "Tier-1 Bank" to Enron at the urging of Andy Fastow.  The reason Defendants wanted to become a "Tier-1 Bank" was because Enron would only "do business" with those who extended its credit.  The business Defendants wanted to "do" with Enron was projected at between $10 and $50 million in investment banking fees per year.  It is not a coincidence, and is fair to conclude, that Defendants "bent" (or disregarded) their own internal rules for handling of the Brinson Fund to find ways to support Enron.  For example, the so-called independent analysts who were responsible for deciding whether to invest in Enron or extend credit to it, had their compensation linked to the profitability of the Defendants, which was impacted by the Enron business relationship.

Answer:

Defendants deny paragraph 18.  Further answering, Defendants aver that the allegations set forth in sentences 2 and 3 refer to alleged business dealings between Enron and UBS Investment Bank, a separate and segregated business unit of UBS.  Defendants were not aware of

these alleged business dealings between Enron and UBS Investment Bank at the time of the

Enron purchases.

Paragraph 19 states:

19.    While Defendants acted imprudently and in their own self-interest with respect to the Brinson Fund's Enron investments, Defendants had secretly taken their *own* money out of Enron before it declared bankruptcy as they were aware of these red flags described above.  For example, while Enron was collapsing throughout 2001, Defendants reduced their own Enron exposure by approximately $400 million.  Indeed, approximately 30 days before Defendants purchased the Enron investments for the Brinson Fund, they began to characterize Enron as a "MELTDOWN" situation, put a "redlight" on Defendants' own Enron lending, and threatened to terminate their "Master Agreement" with Enron due to its financial condition.  While Defendants heeded the red flags that existed prior to October 3, 2001 with respect to the investment of their own money, they ignored them with respect to the Brinson Fund and instead purchased risky Enron debt.

Answer:

Defendants deny paragraph 19.  Further answering, Defendants aver that the allegations

set forth in sentences 2 and 3 refer to alleged actions by UBS Investment Bank, a separate and

segregated business unit of UBS.  Defendants were not aware of these alleged actions taken by

UBS Investment Bank at the time of the Enron purchases.

Paragraph 20 states:

20.    Similarly, there was ample warning prior to the precipitous write-down such that Defendants should have (and could have) sold or disposed of the Enron investments at a loss rather than holding them until the "bitter end," when their value fell to near zero.  For example, on October 16, 2001, Enron announced its first quarterly loss in four years, after taking $1 billion of charges for poorly performing businesses.  The SEC investigation was announced on October 22, 2001.  Andrew Fastow resigned as Enron CFO on October 24, 2001.  More than a month before Enron's collapse, on October 25, 2001, the Fitch debt rating service placed Enron on "negative watch" and on November 5, 2001, lowered Enron to F3, keeping it on "negative watch." Similarly, on October 29, Moody's put Enron on negative watch and on November 9, 2001, put it in the "non-perform" (that is, likely will default) category.  S&P behaved likewise.  Moreover, as noted earlier, Defendants' failure to reprice the Brinson Fund to reflect the true value of the Enron investments over this time frame artificially inflated both the purchase and sale prices of Brinson Fund interests.

Answer:

Defendants deny that there was "ample warning" prior to Enron's default such that Defendants "should have" sold their Enron investments.  Defendants admit that the events alleged in sentences 2 through 4 occurred but deny Plaintiff's inference that these events would have constituted "ample warning" of Enron's impending collapse.  Defendants also admit that Moody's placed Enron on negative watch on October 29, 2001 and reduced its rating to "NP" on November 9, 2001.  Defendants deny any remaining allegations in paragraph 20.

V.  **CAUSES OF ACTION**

 **ERISA Breach of Fiduciary Duty**

Paragraph 21 states:

21.     Plaintiff re-alleges and incorporates by reference herein all facts set out in Paragraphs 7-20 above.

Answer:

Defendants incorporate by reference their answers to paragraphs 7 through 20.

Paragraph 22 states:

22.     Defendants were fiduciaries under ERISA as that term is defined in Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).  As such, Defendants owed fiduciary duties to the Southwest Plans and their beneficiaries as set out in Sections 404, 405, and 406 of ERISA, 29 U.S.C. §§ 1104, 1105, and 1106.  Such duties include the duty to act solely in the interest of the Plan's participants and beneficiaries for the exclusive purpose of providing benefits to the Plan's participants and beneficiaries; the duty not to deal with the assets of the Plan in their own interest and for their own account; the duty to act with the care, skill, prudence, and diligence that a prudent fiduciary would exercise under like circumstances; the duty to act in accordance with the documents and instruments governing the Plan; the duty not to knowingly participate in, or knowingly undertake to conceal, others' breaches of fiduciary responsibility; the duty not to enable other fiduciaries to commit a breach of their duties; and the duty to take reasonable efforts to remedy other fiduciaries' breaches.  Defendants also engaged in conduct and transactions otherwise prohibited by ERISA.

Answer:

Defendants deny the final sentence of the paragraph. The rest the paragraph asserts legal

conclusions to which no response is required.  Defendants deny any remaining allegations in this

paragraph.

Paragraph 23 states:

23.     Defendants have breached their fiduciary duties under ERISA and are liable to the
Southwest Plans for any and all breaches of such fiduciary duties pursuant to Section 409 of
ERISA, 29 U.S.C. § 1109, including, but not limited to, the conduct and breaches referenced
herein.

Answer:

Defendants deny paragraph 23.

Paragraph 24 states:

24.     Defendants' breaches of their fiduciary duties and pursuit of their own self-
interests have resulted in damage and/or loss to the Southwest Plans in excess of $4 million.
Plaintiff herein seeks recovery of such damages and loss on behalf of the Southwest Plans
pursuant to section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2).  Plaintiff also seeks to require
Defendants to disgorge any ill-gotten profits received by them as a result of their improper
utilization of assets belonging to the Southwest Plans.

Answer:

Defendants deny paragraph 24.

**Aiding and Abetting Breach of Fiduciary Duty**

Paragraph 25 states:

25.     Plaintiff re-alleges and incorporates by reference herein all facts set out in
Paragraphs 7-24 above.

Answer:

Defendants incorporate by reference their answers to paragraphs 7 through 24.

Paragraph 26 states:

26.     In the alternative, to the extent that either of the Defendants is found not to have
breached its own fiduciary duties, each of the Defendants actively participated in, took actions in

furtherance of, aided and abetted, and/or conspired with the other Defendant in its breaches of fiduciary duty. Accordingly, the Defendants are liable to the Southwest Plans for the actions taken in furtherance of their overall conspiracy, including, without limitation, their co-Defendant's breaches of fiduciary duty.

Answer:

Defendants deny paragraph 26.

**Attorneys' Fees and Costs**

Paragraph 27 states:

27.     Plaintiff re-alleges and incorporates by reference herein all facts set out in Paragraphs 7-26 above.

Answer:

Defendants incorporate by reference their answers to paragraphs 7 through 26.

Paragraph 28 states:

28.     Pursuant to section 502(g) of ERISA, 29 U.S.C., 1132(g), Plaintiff is further entitled to recover the reasonable attorneys' fees and costs incurred herein, and hereby sues for same.

Answer:

Defendants deny paragraph 28.

Plaintiff's Prayer for Relief states:

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests this matter be set for hearing, and that upon the non-jury trial thereof, Plaintiff, on behalf of the Southwest Plans, be granted a judgment in its favor, awarding the Southwest Plans:

(1)     damages against Defendants to make good to the Southwest Plans the losses resulting from the aforesaid breaches of fiduciary duties in an amount to be proven at trial;

(2)     any profits or benefits that Defendants gained as a result of their breaches of fiduciary duties;

(3)     reasonable attorneys' fees and expenses incurred by Plaintiff herein;

(4)      pre- and post-judgment interest as allowed by law; and

(5)      any other further relief, at law and in equity, to which the Southwest Plans may be justly entitled.

<u>Answer:</u>

To the extent an answer may be required to Plaintiff's Prayer for Relief, Defendants deny each and every allegation contained therein and deny Plaintiff is entitled to the relief requested.

## DEFENSES

1.      The Complaint is untimely, as the tolling period for bringing Plaintiff's claims was exhausted and the statute of limitations for its ERISA claims had elapsed prior to the Complaint's filing on April 24, 2006.

2.      The Complaint fails to state a viable claim for breach of the fiduciary duty of loyalty under ERISA.  Plaintiff cannot establish the prima facie element that Defendants did not discharge their duties "solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries."   29 U.S.C. § 1104(a)(1)(A)(i).

3.      The Complaint fails to state a viable claim for breach of the fiduciary duty of loyalty under ERISA.  Plaintiff cannot establish that Defendants' conduct was motivated by self-dealing or the presence of any conflict of interest.  Instead, Plaintiff alleges Defendants failed to account for the conduct of other, distinct UBS entities, despite Defendants being formally segregated from those UBS entities and being prohibited from the participation in or advisement of those UBS entities' private investment decisions, or their dealings with Enron or any other party.

4.      The Complaint fails to state a viable claim for breach of the fiduciary duty of prudence under ERISA.  Plaintiff cannot establish the prima facie element that Defendants did not discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."   29 U.S.C. § 1104(a)(1)(B).

5.      The Complaint fails to state a viable claim for breach of the fiduciary duty of prudence under ERISA.  Plaintiff cannot establish that any investment conduct by Defendants was inconsistent with the terms of the agreements between and among Brinson, Brinson Trust, and the Southwest Plans.  Instead, Plaintiff alleges Defendants breached internal guidelines or policies, but conduct under ERISA is judged based on compliance with the objective "prudent man" standard, not based on the internal guidelines of a fiduciary.

6.      The Complaint fails to state a viable claim for failing to comply with plan documents under ERISA.  *See* 29 U.S.C. § 1104(a)(1)(D).

7.      The Complaint fails to state a viable claim for co-fiduciary liability under ERISA. *See* 29 U.S.C. § 1105.

8.      The Complaint fails to state a viable claim for a prohibited transaction under ERISA.  *See* 29 U.S.C. §§ 1106(a), 1106(b).

9.      The Complaint fails to state any claim on which damages may be recovered. Plaintiff cannot establish that any breach of duty was the proximate cause of the loss sustained by the Cash Management Fund, or that suffered damages were the foreseeable consequence of any such breach of duty.  Because Plaintiff cannot sustain such a finding of "loss causation," Defendants cannot be held responsible for any losses sustained by the Fund.

Respectfully submitted,

DEFENDANTS UBS GLOBAL ASSET
MANAGEMENT (AMERICAS), INC., AND
UBS GLOBAL ASSET MANAGEMENT
TRUST CO.

March 1, 2007                              /s/ James V. Hart
                                           *Attorneys for Defendants*

Vincent J. Connelly                        Sharon A. Israel
Howard J. Roin (*of counsel*)                Texas Bar No. 00789394
Jennifer L. Rakstad                        MAYER, BROWN, ROWE & MAW, LLP
James V. Hart                              700 Louisiana Street, Suite 3400
MAYER, BROWN, ROWE & MAW, LLP             Houston, Texas 77002-2730
71 South Wacker Drive                      Tel: (713) 238-2630
Chicago, Illinois 60606-4637              Fax: (713) 238-4630
Tel: (312) 782-0600                        E-mail:  sisrael@mayerbrownrowe.com
Fax: (312) 701-7711

## <u>CERTIFICATE OF SERVICE</u>

I, James V. Hart, an attorney, hereby certify that a true and correct copy of **DEFENDANTS' ANSWER TO PLAINTIFF'S ORIGINAL COMPLAINT** was served on the following Counsel of Record via electronic delivery on March 1, 2007:

Edward P. Perrin
Jennifer R. Poe
HALLETT & PERRIN, P.C.
2001 Bryan Street, Suite 3900
Dallas, Texas 75201
(214) 922-4165

Respectfully submitted,

March 1, 2007                          /s/ James V. Hart

James V. Hart

*Attorney for:* DEFENDANTS UBS GLOBAL ASSET MANAGEMENT (AMERICAS), INC., AND UBS GLOBAL ASSET MANAGEMENT TRUST CO.